**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**David Allen MERRITT,**
**Defendant-Appellee.**

No. 80–1463.

United States Court of Appeals,
Tenth Circuit.

Dec. 28, 1982.

1264

Janis E. Chapman, Asst. U.S. Atty., Denver, Colo. (Joseph F. Dolan, U.S. Atty., Denver, Colo., with her on the brief), for plaintiff-appellant.

E. Ricardo Gonzales, Denver, Colo., for defendant-appellee.

Before DOYLE and SEYMOUR, Circuit Judges, and ANDERSON,* District Judge.

ALDON J. ANDERSON, District Judge.

## INTRODUCTION

In the early morning hours of March 21, 1980, the defendant sat with others in a truck parked on a residential street in Denver, Colorado. While sitting there, they were confronted by police from the Denver Police Department and ordered out of the truck. At the time, the police were looking for a Texas fugitive wanted for murder. They had been informed he may be coming, and believed he might be one of the people in the truck.

After the three people got out of the truck, it was searched for weapons. The police found a .22 caliber revolver located under the driver's seat.

The driver, defendant Merritt, was subsequently indicted under 18 U.S.C. Appendix section 1202(a) for possession of a firearm, as a previously convicted felon.[1] Defendant later moved to suppress the revolver, as well as certain inculpatory statements that he allegedly made shortly after the revolver was found when interviewed by an F.B.I. agent. He contended at the hearing that the police lacked sufficient justification for confronting him and his companions in the truck. Therefore, the gun and statements must be suppressed. In the alternative, the statements were not made voluntarily and thus should be suppressed on that basis as well.

The district court found that the police in stopping and detaining defendant had indeed violated his Fourth Amendment rights. Accordingly, it suppressed both the revolver and defendant's statements as fruit of the Fourth Amendment violation. Since this finding required granting defendant's motion in its entirety, it was unnecessary for the district court to rule whether defendant's statements had been made voluntarily.

The United States has taken this interlocutory appeal from the order of the district court, as authorized by 18 U.S.C. section 3731. We have carefully reviewed the Record on Appeal in this case, as well as the briefs of counsel and the arguments presented at oral argument. We conclude that the district court's ruling that defendant's Fourth Amendment rights were violated was contrary to law.

## FACTS

The transcript of the suppression hearing reveals some conflict in the testimony of the witnesses. The facts are recounted below resolving all disputes in favor of defendant's version of what happened.

As previously indicated, defendant's encounter with the Denver police and subsequent indictment came about as a by-product of a police search for one Thomas Lloyd Gerry, wanted in Texas for murder. On March 11, 1980, Sergeant Talty of the Denver Police Department, who testified at the hearing, was advised by his superior, Detective Wattles, that Gerry might be found at 5077 Sherman Street in Denver. (18) ** Sergeant Talty was told that Gerry was wanted in Texas, and that he was heavily armed and should be considered dangerous. (18)

Talty proceeded to the residence at 5077 Sherman. (19) Due to the evident risk of

---

* Honorable Aldon J. Anderson, Chief Judge, United States District Court for the District of Utah, sitting by designation.

1. The indictment charges that in 1963 defendant was convicted of burglary in Colorado state court.

** All parenthetical references are to the transcript of the suppression hearing.

apprehending such a dangerous suspect, he called in the Denver police SWAT team to surround the house in the event resistance was encountered. (18)

Sergeant Talty entered the house with several other officers (19) at approximately 10:45 p.m. that evening, but Gerry was not there. Two female juvenile runaways were found in the house.[2] (20, 32) One of them indicated that Gerry had been staying there, and should be returning later that evening.[3] (19, 22)

While in the house Sergeant Talty observed in the front bedroom an impressive array of weapons and ammunition. There were at least three handguns, one shotgun, and what appeared to be an automatic rifle, together with about 200 rounds of ammunition for the automatic rifles, several for the shotgun, and 30 to 40 rounds for the various handguns. In addition there was ammunition for a handgun the police could not find. (20–21)

After the police had observed the inside of the house, one of the female runaways was taken into custody by uniformed officers. (32) At that point some officers stayed at the house with the other female, (19) while Sergeant Talty and the majority of officers left in their vehicles to set up a stakeout throughout the neighborhood. (19)

The stake-out continued for several hours until Officer Diehl, who also testified at the hearing, was instructed by Sergeant Shinofield, a SWAT team supervisor (21–22) participating in the stake-out, that he should proceed to 5077 Sherman to assist in taking the remaining female runaway into custody. (4) Diehl was told to move quickly because he was in a marked vehicle that would alert Gerry to police suspicion if Gerry were to show up while the marked car was parked outside. (4)

Officer Diehl approached 5077 Sherman with his partner (5) at about 1:00 a.m. (21, 28) the morning of March 12. Just as he pulled up to the residence on Sherman, he saw a white pickup truck heading east on 51st Street pull up to the intersection of 51st and Sherman, just north of the house. (5) Diehl observed the truck stop at the intersection, and then continue east on 51st Street.

When Officer Diehl and his partner entered the house to take the female into custody, they and the four other officers already there (5) were advised by Sergeant Shinofield, the SWAT team supervisor. Sergeant Shinofield was located in an unmarked car facing south on Sherman Street, north of the intersection of Sherman and 51st Streets, in a position where he could view, across the intersection, the residence at 5077 Sherman. (6) The officers in the house, and apparently the other police involved in the stake-out, were notified that, as Officer Diehl testified,[4] "a white pickup truck that had been at the stop sign just as we entered the house had come [sic] around the block, and pulled up behind him, and that it had turned its lights out and there appeared to be several people in the truck, and they had crouched down, and he asked for some officers to go up and assist him in finding out who the people were." (6)

The officers then left 5077 Sherman. Officer Diehl and his partner placed the remaining female runaway in their cruiser (8) and drove to a point about 40 feet south of the suspect vehicle, and across the street. (8) Simultaneously two other officers[5]

---

2. The Record gives no indication who these female "juvenile runaways" (32) were, nor what connection, if any, they may have had with Thomas Lloyd Gerry or the defendant.

3. Sergeant Talty's testimony indicates only that he "receiv(ed) information" (19, 22) that Gerry would be returning that evening, without specifying who supplied the information. Defendant's brief states that "(t)he runaway was able to identify (for the police) a photograph of a

Thomas Lloyd Gerry as a person who sometimes stayed at 5077 Sherman." Brief of Appellee, p. 2.

4. Sergeant Shinofield did not testify at the hearing.

5. These officers did not testify at the hearing, nor did any of the witnesses that did testify identify them by name.

who had circled the block pulled their cruiser up behind the suspect vehicle. (7)

The officer driving this car got out of it, rested a shotgun on the top of the car, and told defendant and the two other occupants of the car to get out. (52) At the same time, his partner approached the vehicle from the other side. (52) Meanwhile, Officer Diehl's partner, Officer Schulke, had walked north from Diehl's cruiser to a point directly across the street from the white truck. (8, 53) He, too, held a shotgun on the three suspects. (53) Officer Diehl stood by his cruiser to keep an eye on the female runaway. (8)

The suspects were ordered to move to the rear of the truck, (53) where the police met them and told them to "freeze." (54) One of the two shotguns was pointed at defendant throughout the incident. (53) Shortly there were six or seven police cruisers at the scene, and roughly 12 to 15 police, (53) two or three of whom carried shotguns. (58)

The police obtained identification from the three suspects. (10) One was the defendant, David Allen Merritt; one his common-law wife, Debra Mitchell; the third was Thomas Lloyd Gerry.

After they were removed from the truck, Sergeant Talty (who had been to the house at 10:45 p.m. and then joined the stake-out) appeared on the scene. (57) Talty asked one of the officers present if the truck had been checked for weapons, and was advised that it had not. (24) He then searched the truck with his flashlight, (29) and found a loaded .22 revolver protruding about a quarter of an inch out from under the driver's seat. (25) At this point Sergeant Talty told an officer that he had found a gun to which, according to Talty's testimony,

Merritt offered the response "the gun belongs to me." [6] (33) Sergeant Talty then took the weapon and gave it to Officer Diehl. (25–26) Merritt was arrested.[7]

## THE RULING BELOW

The district court suppressed the revolver, as well as inculpatory statements allegedly made by defendant at the scene and several days later to an F.B.I. agent, on the ground that the police detention of defendant violated his Fourth Amendment rights. In its remarks at the conclusion of the hearing, the court stated two alternative bases for this conclusion. First, it found that the police did not, at the time they ordered defendant from his truck, have the reasonable suspicion necessary to make an investigatory stop. Second, the district court indicated that even if there were reasonable suspicion to make a stop, the police conduct here in fact constituted an arrest, not a stop, for which there was no probable cause.

On this appeal the Government concedes the police, when the stop was made, did not have probable cause to make an arrest. *See* Brief of Appellant, pp. 7–8. It is argued, however, that the information known to the police before the truck was confronted gave rise to a reasonable suspicion sufficient to justify stopping the truck, and that the search was conducted properly as an incident to the stop.

Thus, three issues must be resolved: 1) Did the police have reasonable suspicion to stop and interrogate the occupants of the truck?; 2) Was the search of the truck incident to the stop proper?; and 3) Did the police, due to the manner in which they confronted and detained defendant and his

---

**6.** Defendant denies having said this. He contends that, in response to Talty's question "Whose is this?" he responded "I am in possession of the truck," but never admitted owning the gun. (56) This factual dispute is irrelevant to our disposition of this appeal, since we address only the Fourth Amendment issue whether any inculpatory statements defendant may have made were secured by "exploitation of (the) illegality" of his detention by the police. *Wong Sun v. United States,* 371 U.S. 471, 488,

83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). What defendant may have actually said after he was confronted by the police has no bearing on the Fourth Amendment issue before us.

**7.** Gerry was also arrested for suspicion of murder. Debra Mitchell likewise was arrested for possession of marijuana that was also found by Sergeant Talty when he searched the truck. (11)

companions, in fact arrest them, without probable cause?

## ANALYSIS

### 1. THE POLICE HAD REASONABLE SUSPICION TO STOP, DETAIN AND INTERROGATE THE OCCUPANTS OF THE TRUCK.

█ The Supreme Court held in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that a police officer who observes suspicious circumstances may, though he lacks the probable cause traditionally necessary to make an arrest, stop an individual briefly to investigate the circumstances provoking suspicion, provided the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. To determine whether an investigatory stop is justified, "the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."[8] *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

This Court has on several occasions applied the above principles to the facts of particular cases. *United States v. Torres,* 663 F.2d 1019 (10th Cir.1981); *United States v. Merryman,* 630 F.2d 780 (10th Cir.1980); *United States v. Leyba,* 627 F.2d 1059 (10th Cir.1980); *United States v. Pelley,* 572 F.2d 264 (10th Cir.1978); *United States v. Sperow,* 551 F.2d 808 (10th Cir. 1977).

█ In assessing whether the police in this case had sufficient justification to make an investigatory stop we must, of course, look to the knowledge of all the police involved in this criminal investigation, since "probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest."[9] *United States v. McManus,* 560 F.2d 747, 750 (6th Cir. 1977). *See also United States v. Matthews,* 615 F.2d 1279, 1284 n. 5 (10th Cir.1980); *United States v. Goeltz,* 513 F.2d 193, 197 (10th Cir.1975).

█ The precedent cited clearly applies. The collective knowledge of the police here was of serious import, and would reasonably create an apprehension of great danger. *Cf. United States v. Sperow,* 551 F.2d 808 (10th Cir.1977). The Denver police knew, through Detective Wattles, that Thomas Lloyd Gerry, a dangerous fugitive, was staying at 5077 Sherman Street in Denver. This report was corroborated when one of the females found at the residence advised Sergeant Talty that Gerry sometimes stayed there, and would be returning. Later, while Officer Diehl's marked vehicle was parked in front of the residence, Sergeant Shinofield observed a white pickup truck heading east on 51st Street stop at the intersection and then continue east. Shortly thereafter, the same white truck, having apparently circled the block, pulled up about 50 feet directly behind Shinofield's vehicle, and parked facing toward Diehl's cruiser. The truck's lights went out, and Shinofield observed what appeared to be several people in the truck who, instead of exiting it, crouched down.

---

**8.** While cases discussing investigatory stops usually involve police suspicion that an individual is, or is about to be, involved in criminal activity, the Supreme Court has noted what is perhaps obvious, that "an officer may stop and question a person if there is reasonable grounds [sic] to believe that person is wanted for past criminal conduct. *United States v. Cortez,* 449 U.S. 411, 417 n. 2, 101 S.Ct. 690, 695 n. 2, 66 L.Ed.2d 621 (1981). *See, e.g., United States v. Torres,* 663 F.2d 1019 (10th Cir.1981).

**9.** We recognize that this case, where the issue is whether there was reasonable suspicion to make an investigatory stop, differs from previous cases in which we have held that probable cause for an arrest may be based on the collective knowledge of the police. We hold that the principle applies identically where the collective knowledge of the police forms the basis for a stop. *See Brewer v. Wolff,* 529 F.2d 787, 790 (8th Cir.1976).

We hold that under these circumstances the police had "a particularized and objective basis," *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 to make an investigatory stop to determine the identities of those in the truck, *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), and "investigate the circumstances that provoke suspicion." *United States v. Brignoni-Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). We have little difficulty in reaching this conclusion, inasmuch as defendant apparently *concedes* that the above-cited facts known to the police were sufficient to justify an investigatory stop. *See* Brief of Appellee, pp. 3, 7.

Apparently the district court, in weighing the testimony adduced by the Government to support the existence of reasonable suspicion, excluded from its consideration the key testimony of Officer Diehl and Sergeant Talty that Sergeant Shinofield had seen a white truck circle the block, pull up behind him, park, and its occupants crouch down. The court ruled that testimony by either of these officers as to what they were told during the stake-out by Sergeant Shinofield, who did not testify, was inadmissible hearsay. (22) Therefore, it evidently did not consider these facts in ruling on the reasonable suspicion issue.[10] (66–7) Though the proffered testimony was twice excluded by the district court,[11] the testimony had come in anyway earlier in the hearing through Officer Diehl, without objection. (6) Therefore, though the testimony was not considered by the district court in deciding the reasonable suspicion issue, we have the benefit, on this record, of knowing what that excluded testimony was. (See "Facts," where testimony is set out.)

For the reasons set out below, we have determined that the district court should have considered this hearsay testimony, and that this piece of information, added to the other information known to the police at the time, is sufficient to support the conclusion that the police had reasonable suspicion to make an investigatory stop.

■ The purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments. In this type of hearing the judge had latitude to receive it, notwithstanding the hearsay rule. Rule 104(a) of the Federal Rules of Evidence provides as follows:

(a) *Questions of admissibility generally.* Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Rule 1101(d)(1) is to the same effect.[12]

The Supreme Court had occasion to apply these rules in *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), a case which provides helpful guidance for the disposition of this issue. In *Matlock* the issue before the Court was whether the Government had, at a suppression hearing before the district court, made a sufficient showing to establish the voluntary consent of a third party to search certain premises where evidence tending to inculpate the defendant was found. In the district

10. Without the facts observed by Sergeant Shinofield concerning the truck and its occupants, the district court's ruling is clearly correct, since Shinofield's observations alone serve to identify this truck as a suspicious vehicle.

11. The district court sustained defendant's objection to any testimony by Officer Diehl concerning what Shinofield had told him, (7) and later sustained a similar hearsay objection to testimony by Sergeant Talty regarding what Sergeant Shinofield had said. (21–22).

12. Rule 1101(d)(1), Federal Rules of Evidence, provides as follows:

(d) *Rules inapplicable.* The rules (other than with respect to privileges) do not apply in the following situations:

(1) *Preliminary questions of fact.* The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104.

court's view the Government, to succeed on the consent issue, had to prove: 1) that the third party, defendant's girlfriend, had actual authority to consent to the search, and 2) that the searching officers held the good faith belief that she had authority to so consent. To make the required showing, the Government offered testimony of various witnesses as to what defendant's girlfriend had told the officers relating to their cohabitation in the searched premises. The district court held these out of court statements admissible to show the searching officers' good faith, but inadmissible as hearsay, to prove her authority in fact to consent to the search. Having thus excluded much of the critical testimony proffered by the Government to show actual authority, the district court concluded that the Government had failed to meet its burden on the consent issue, and granted the motion to suppress.

The Supreme Court reversed, noting that under Rules 104(a) and 1101(d)(1), the district court "is not bound by the Rules of Evidence except those with respect to privilege." 415 U.S. at 174, 94 S.Ct. at 994. The Court ruled that "the trial judge should not have excluded (defendant's girlfriend's) statements in the circumstances present here." *Id.* at 175, 94 S.Ct. at 995. First, it was apparent to the Court that the district court believed the statements had in fact been made. In addition, nothing in the record raised serious doubt about the truthfulness of what had been said. Further, her statements were internally consistent, and were corroborated by other evidence offered at the hearing. Finally, the Court noted that the gist of what she had told the police, that she was living with the defendant out of wedlock, "would not seem to be a relationship that one would falsely confess." *Id.* at 176, 94 S.Ct. at 996. In light of all the foregoing, the Court concluded that "there was no apparent reason for the judge to distrust the evidence and to exclude Mrs. Graff's declarations from his own consideration for whatever they might be worth in resolving, one way or another, the issues raised at the suppression hearings." *Id.*

In the present case, likewise, the record gives no indication that the information received from Sergeant Shinofield by the other officers in the stake-out was false, nor that the district court had any reason to doubt the statements were made. Further, Shinofield's statements are corroborated by other testimony adduced at the hearing: Officer Diehl observed the white truck stop at the intersection of 51st and Sherman before entering the residence at 5077 Sherman, and upon leaving the residence, saw the same white truck that he had observed and Shinofield had reported positioned just where Shinofield said it would be. Finally, and most significantly, it is manifest that Sergeant Shinofield would have no motivation to lie to his fellow officers while they were attempting, as a group, to find a heavily armed, dangerous murder suspect. Shinofield had every reason to report his observations of suspicious behavior accurately.

Since the police may rely on hearsay, even the hearsay of an anonymous but reliable informant, *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), as the basis for reasonable suspicion to make a stop, they should also be permitted to offer that same hearsay as testimony to support their reasonable suspicion when a defendant moves to suppress evidence on the ground that reasonable suspicion did not exist. As the Court observed in *Adams v. Williams, supra,* "the subtleties of the hearsay rule should not thwart an appropriate police response." *Id.* at 147, 92 S.Ct. at 1924. There was no need for the district court to exclude from its consideration the proffered out of court statements of Sergeant Shinofield. *Matlock* counsels that these statements should have been considered "for whatever they might be worth in resolving, one way or another, the issues raised at the suppression hearings." 415 U.S. at 176, 94 S.Ct. at 996. *See also United States v. Lee,* 541 F.2d 1145 (5th Cir. 1976).

We find that the excluded evidence, when considered together with the other evidence

that was heard by the district court on the reasonable suspicion issue, is sufficient to require the conclusion as a matter of law that the police had reasonable suspicion to make an investigatory stop. Normally it would be proper to remand the case to have the district court hear additional evidence, particularly the excluded hearsay testimony. *See, e.g., United States v. Lee, supra* at 1146. In this case, however, we have the benefit of knowing what the evidence that the district court excluded from its consideration was, since the testimony of Sergeant Shinofield's statements was fully presented without objection on one occasion, (6) though excluded on two others. (7, 21–22) For the reasons previously stated, the excluded statements are inherently trustworthy. Therefore, the record is sufficiently complete to permit us to reverse the trial court on this point and forego the necessity of remand. *See Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975). *Cf. Morales v. New York,* 396 U.S. 102, 105–6, 90 S.Ct. 291, 293, 24 L.Ed.2d 299 (1969).

## II. THE SEARCH OF THE TRUCK WAS JUSTIFIED AS A LIMITED PROTECTIVE SEARCH.

■ Police conducting an investigatory stop are entitled to make a limited search for weapons that might be used to harm them. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court stated:

[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

392 U.S. at 24, 88 S.Ct. at 1881. *See also Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

While *Terry*'s discussion was limited to pat-down searches of the person, this Court has recently held that the rationale stated in *Terry* for such searches, "the protection of the police officer and others nearby," 392 U.S. at 29, 88 S.Ct. at 1884, dictates that the police should also be permitted to conduct a limited search for weapons in a vehicle that a suspect has just left. *United States v. Romero,* 692 F.2d 699, 702–704 (10th Cir., 1982). While the police are questioning a suspect during an investigatory stop, there is always some risk that he may attempt to escape and grab a weapon that was hidden in the vehicle before he was summoned out of it. Thus, where the police believe that a particular suspect may be armed and dangerous, they should be permitted to "frisk" his vehicle as well as the individual "to discover guns, knives, clubs or other hidden instruments for the assault of the police officer." *Id.* The *Terry* search principle has been extended to vehicles by other circuit courts of appeals. *United States v. Rainone,* 586 F.2d 1132 (7th Cir.1978); *United States v. Green,* 465 F.2d 620 (D.C.Cir. 1972). *But see Government of Canal Zone v. Bender,* 573 F.2d 1329 (5th Cir.1978).

■ Here, the police confronted the white pickup truck because they suspected that Thomas Lloyd Gerry, who was wanted for murder in Texas, might be in it. They were advised that he was heavily armed and should be considered dangerous. Furthermore, they had observed at 5077 Sherman Street, where Gerry was reportedly staying, a large assortment of deadly weapons and ammunition. Some of the ammunition would fit a type of revolver that the police had not seen at the house.

These facts known to the police gave them ample reason to suspect that one or more of the truck's occupants might be armed and dangerous. Thus, when Sergeant Talty arrived on the scene and found that the truck had not yet been searched for weapons, he was justified in using his flashlight to examine the cab of the truck

for weapons to which the occupants might gain access if they attempted escape and bolted towards the truck.

Accordingly, we conclude that the search of the truck was proper, and that the revolver should not have been suppressed.

### III. THE DETENTION WAS A STOP, NOT AN ARREST.

Finally, we address defendant's argument, accepted by the trial court, that, due to the manner in which the police confronted defendant in the truck, he was in fact arrested, not merely stopped. Since the Government concedes there was no probable cause to make an arrest, Brief of Appellant, pp. 6–7, a finding that defendant was in fact arrested would require suppression of both the revolver and defendant's inculpatory statements.[13]

This issue presents difficulty in the case before us due to the show of force employed by the police in making the stop. According to defendant's testimony, he was ordered to exit his truck by four police officers, two that had pulled up behind him, and two that pulled up across the street. Two held shotguns; one behind defendant, and one stationed across the street. One of the officers held a shotgun on defendant throughout the incident. Defendant and his companions were told to move to the rear of the truck, and "to freeze and don't move." (54) After they were moved to the rear of the truck, the police obtained their identification. (10) Eventually six or seven police cars arrived at the scene, with a total of about 15 police. Two or three, in addition to the original two, carried shotguns, but did not point them. (58)

■ To determine whether the police conduct described above violates defend-

ant's Fourth Amendment rights because it in fact constituted an arrest without probable cause, we must ask whether the police detention, a "seizure" [14] of the person, was "reasonable." The reasonableness of police conduct is, of course, the touchstone of Fourth Amendment analysis. *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Under *Terry,* we must assess "the reasonableness in all the circumstances of the particular invasion of a citizen's personal security," *id.,* to determine "whether the officer's action was justified at its inception,[15] and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. at 1879. *Terry* also recognizes that in assessing the reasonableness of a police detention, "we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." *Id.* at 24, 88 S.Ct. at 1881. Our analysis thus focuses on whether, in light of all the pertinent information known to the police at the time of the stop, their conduct was reasonable.

■ When the Denver police approached the white pickup in the middle of the night, they were looking for a murder suspect reported to be armed and dangerous. They also knew that many weapons were kept at the residence where the suspect was supposed to be staying, thus confirming the suspicion that he, and others he was with, might well be armed.

In light of these facts it is proper to hold that the police here acted reasonably in stopping defendant and his companions in the manner they did. Their conduct was justified by the need to ensure their own protection.

---

**13.** After the defendant makes a showing that there has been an arrest without probable cause, the Government, to establish the admissibility of the evidence, would still be entitled to prove that the disputed evidence is not "tainted" by the Fourth Amendment violation. *Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969); *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963); *United*

*States v. Simpson,* 453 F.2d 1028, 1031 (10th Cir.1972).

**14.** *See Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968).

**15.** We have already addressed this part of the *Terry* analysis, concluding the police did have reasonable suspicion to initiate an investigatory stop.

First, the law is settled that the police may, in connection with an investigatory stop, order an individual out of his vehicle. In *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the Supreme Court held that the police may, when they stop a vehicle for a traffic violation, order the driver out of the car, even though there is "no reason to suspect foul play from the particular driver at the time of the stop ..." *Id.* at 109, 98 S.Ct. at 332. The Court, taking note of the risks involved in approaching an individual seated in his car, found that the intrusion into the driver's personal liberty is justified "as a precautionary measure to afford a degree of protection to the officer...." *Id.* at 110, 98 S.Ct. at 333. Therefore, the police here, suspecting that they were stopping an armed and dangerous murder suspect, acted properly when they ordered defendant and his colleagues out of the truck. *United States v. White,* 648 F.2d 29, 36–40 (D.C.Cir. 1981); *United States v. Williams,* 604 F.2d 1102, 1124 (8th Cir.1979).

The police were also justified in holding shotguns on the suspects during the course of the stop. A number of courts have passed on the question whether the use of a drawn gun in connection with an investigatory stop is unreasonable and thus converts the stop into an arrest. Though some have taken the view that the use of guns automatically turns the stop into an arrest, *United States v. Strickler,* 490 F.2d 378, 380 (9th Cir.1974), we feel that the better view is that the use of guns in connection with a stop is permissible where the police reasonably believe they are necessary for their protection.

In *United States v. White,* 648 F.2d 29 (D.C.Cir.1981), for example, the District of Columbia Court of Appeals held that two policemen, acting solely on an anonymous informant's tip that the occupants of a certain Oldsmobile were carrying drugs, acted reasonably in approaching the car with their guns drawn, and ordering the occupants to get out of the car and place their

hands on the dashboard. Similarly, the Second Circuit held, in *United States v. Jackson,* 652 F.2d 244 (2d Cir.1981), that an officer who stopped an individual in his car with reasonable suspicion that he had just robbed a bank was justified in drawing his gun as he approached the vehicle. The Court noted the "dangerous dilemma" police officers face in situations like this, "where suspicion does not rise to the level of probable cause. If the officer approaches a suspected robber with his gun still in his holster, he increases the risk that he will be shot. If, on the other hand, he protects himself by drawing his gun, he increases the risk that a court will set the criminal free by construing his action as an illegal arrest." *Id.* at 249–250. *See also United States v. Bull,* 565 F.2d 869, 870 (4th Cir.1977); *United States v. Russell,* 546 F.2d 839, 840 (9th Cir.1976); *United States v. Maslanka,* 501 F.2d 208, 213 n. 10 (5th Cir.1974).

We believe that the police in this case, having the reasonable suspicion that at least one of the occupants of the truck might be heavily armed and dangerous, acted reasonably in holding shotguns on the suspects during the course of the stop.

The case before us is distinguishable in one important respect from previous cases where courts have held that the use of guns in connection with a stop is constitutionally permissible. Here, according to defendant's testimony, the shotguns of the two police involved in the initial confrontation of the truck were not merely drawn, they were also *pointed* at the suspects. Indeed, defendant testified that one of the guns was "on" him "[t]hroughout the whole thing." (53) This fact apparently assumed some significance in the district court's reasoning. In a colloquy with counsel near the end of the hearing, the court remarked: "You don't think to shove a gun in a man's face is arresting him?" (68) [16] At least one court has indicated that there might be a constitutionally significant difference between merely drawing guns, and pointing them.

**16.** In fact, there was no testimony that the police "shoved a gun" in anyone's face. Defendant's testimony was that one of the guns was "on" (53) him throughout the incident.

In *United States v. White*, 648 F.2d 29 (D.C.Cir.1981), the Court noted that "[t]he officers did not wave or brandish their guns, but rather kept them at their sides when approaching the car." *Id.* at 36.

In our view, however, it was not unreasonable in the situation here for the police to have their guns pointed. The police had a reasonable suspicion that they were dealing with a murderer who was heavily armed who might pose a serious threat to their safety and that he had with him others who could lend him support. One Court has made the pertinent observation that "[a]s a society, we routinely expect police officers to risk their lives in apprehending dangerous people. We should not bicker if in bringing potentially dangerous situations under control they issue commands and take precautions which reasonable men are warranted in taking." *Bailey v. United States*, 389 F.2d 305, 315 (D.C.Cir.1967). Certainly here, where the circumstances clearly justified the police in having their guns drawn, they should also be permitted to point them where necessary to ensure their safety. To otherwise constrain the police in such situations would subject them to unreasonable risks, and seriously hamper their efforts to apprehend dangerous criminal suspects. We find that the incremental intrusion visited upon a citizen's personal security by having a gun pointed at him instead of merely drawn, as was true here, is outweighed by the increased protection the police afford themselves by making certain of their safety in face of the danger presented.

 The courts that have addressed the issue of the reasonableness of a stop have focused on the question whether, due to the degree of force used by the police, the confrontation was in fact an arrest, not merely a stop. Under this analysis it is apparently assumed that at some point the show of force made by police conducting a stop becomes so great as to render it an arrest, regardless of the justification that may ex-

ist for the degree of force used. Resolution of the question turns on the amount of force used to effect the stop: one level of force is permissible when there is probable cause for an arrest, but when the police have only a reasonable suspicion, only a more restricted use of force is permitted.

It seems to us that to focus the analysis in this manner diverts attention from the court's true concern in any Fourth Amendment case—whether the police conduct, in light of all the circumstances, was reasonable. We should not ask whether the force used was so great as to render it an arrest but, instead, whether the force used was reasonable. Whenever the police confront an individual reasonably believed to present a serious and imminent danger to the safety of the police and public, they are justified in taking reasonable steps to reduce the risk that anyone will get hurt. They should not be constrained in their effort to reduce the risk of injury or death simply because the facts known to them create a reasonable suspicion, but do not rise to the level of probable cause.

Defendant has failed to produce any evidence to demonstrate that his detention at gunpoint was unreasonable.[17] Moreover, it would seem that until the truck was searched by Sergeant Talty there remained the possibility that defendant or one of the other suspects might attempt to escape from where they were detained at the back of the truck and seize a weapon hidden in the truck. Thus, the continued use of guns to secure their detention was justified at least until the protective search of the truck was completed. After the search uncovered a weapon under the driver's seat, where defendant had been sitting, there was probable cause to arrest him. At that point the police would of course be entitled to continue detaining him at gunpoint.

## CONCLUSION

In sum, we hold that the police had reasonable suspicion to make an investigatory

---

17. Defendant bears the initial burden of demonstrating some Fourth Amendment violation by the police. *Alderman v. United States*, 394

U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969); *United States v. Simpson*, 453 F.2d 1028, 1031 (10th Cir.1972).

stop to interrogate the occupants of the white pickup truck, that the search of the truck was a properly conducted limited protective search under the circumstances, and that the police confrontation of defendant was a stop, not an arrest. Therefore, we reverse the judgment of the district court that the revolver, and statements made by defendant must be suppressed as fruit of a Fourth Amendment violation.

Because the district court's ruling was based solely on its finding of a Fourth Amendment violation, it did not reach the question, also raised by defendant in his motion to suppress, whether certain statements made by him should be suppressed on the independent ground that they were obtained in violation of his Fifth Amendment rights. The issue was not addressed in any detail at the suppression hearing. Consequently, the record is inadequate to permit appellate resolution of this issue. Therefore, we remand the cause to permit the district court to resolve the Fifth Amendment issue in the first instance. *See Morales v. New York,* 396 U.S. 102, 105–6, 90 S.Ct. 291, 293, 24 L.Ed.2d 299 (1969).