(811 P.2d 890)

No. 65,410

STATE OF KANSAS, *Appellee,* v. FLOYD M. NUGENT, *Appellant.*

Opinion filed May 17, 1991.

*Joseph L. Dioszeghy,* of Overland Park, for appellant.

*Steven J. Obermeier* and *Debra A. Vermillion,* assistant district attorneys, *Paul J. Morrison,* district attorney, and *Robert T. Stephan,* attorney general, for appellee.

Before BRAZIL, P.J., DAVIS and RULON, JJ.

BRAZIL, J.: Floyd M. Nugent appeals his conviction of robbery, K.S.A. 21-3426, claiming the court erred by failing to suppress the victim's on-scene identification and all items seized from his van pursuant to a search incident to his arrest. Nugent claims that, although Officer Craig Caster may have had articulable suspicion to stop him, Caster's actions exceeded that of a stop pursuant to *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), and constituted an arrest without probable cause. We affirm, finding no reversible error.

Dorothy L. Wages had opened the Texaco gas station at 7720 State Line Road in Prairie Village, Kansas. She heard someone enter the store. It was 6:39 a.m. Wages turned and saw a black male wearing a white baseball cap; a blue bandana covering the

lower part of his face; a hooded, long-sleeved, blue sweatshirt; and fairly new blue jeans. The man's left hand was in his sweatshirt pocket. The man said to Wages, "Give me your money." Wages responded she could not open the cash register. He then said, "Give me your damn money," and slammed his right fist on the counter. While Wages was opening the register, she pushed an alarm button that sounded at the police department. Wages removed the money from the register. She also removed two dollars that tripped an automatic alarm that also alerted the police. Wages handed the money to the man, who took it and exited the west door of the station. When he was leaving, Wages noticed he wore very white tennis shoes, which looked brand new. Wages watched the man head north towards the Southgate Financial Center. Texaco is situated on the west side of State Line just south of Cambridge Road. Southgate Financial is located across the street from Texaco on the north side of Cambridge on State Line. Wages estimated $85 to $95 had been taken. An audit showed $93 missing.

Police Officer Caster and Sergeant Ozorkiewicz, each in their own squad car, were about two blocks away from the Texaco station when the alarm went out. While the officers were en route to the Texaco station, the dispatcher informed them that an armed robbery had just occurred and a suspect described as a black male was running north through the Southgate parking lot on the west side. He was wearing a white cap, blue hooded sweatshirt, blue jeans, blue bandana, and white tennis shoes. They arrived at the scene about a minute after the dispatch. Ozorkiewicz went to Texaco, and Caster went to the Southgate parking lot.

Caster drove north through the lot then turned on the north end heading east. He saw a black van backed into the building on the north side facing north. It was the only vehicle in the lot. About one and a half to two minutes had elapsed from the first alarm until he saw the van. Caster drove by the van and looked in and saw a black man sitting inside with "a very worried look on his face." The man was not wearing a shirt or cap. Caster continued past the van about 10 to 15 feet. He slowed to go back and look at the van, but the man had hurriedly driven away. Caster exited the lot onto State Line then turned onto 76th Street

heading west. He approached the van, which was going east on 76th Street, activated his emergency lights, and stopped the van. The man quickly exited the van while Caster was still in his car. The man said, "What did I do?" He was wearing blue jeans and white tennis shoes. The left side of the man's body was obscured from view. Caster got out of his car with his shotgun drawn, ordered the man (Nugent) down on the ground, and handcuffed him. He testified he did so for his safety. Nugent was on the ground for about 30 seconds. Caster then stood him up, and, at that time, Ozorkiewicz arrived with Wages to identify the man. Wages positively identified Nugent as the robber. At that time, Nugent was told he was under arrest. In a search incident to the arrest, police found a blue hooded sweatshirt, a whitish baseball cap, and a blue bandana under the driver's seat. They also found a wad of money in small bills, surgical rubber gloves, and chrome pliers in the front pocket of the sweatshirt.

Nugent argues Caster's actions exceeded a *Terry* stop and that the evidence seized must be suppressed since he was arrested without probable cause. The State responds the court's denial of Nugent's motion to suppress was correct as it was reasonable under the circumstances for Caster to display his shotgun and place Nugent in handcuffs before he was identified by the victim and arrested about 30 seconds later.

"If the findings of the trial court on a motion to suppress evidence are based upon substantial evidence this court on review will not substitute its view of the evidence for that of the trial court." *State v. Chiles*, 226 Kan. 140, 144, 595 P.2d 1130 (1979).

The Kansas stop and frisk rule is codified in K.S.A. 1990 Supp. 22-2402 and provides:

"**Stopping of suspect.** (1) Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand . . . the name [and] address of such suspect and an explanation of such suspect's actions.

"(2) When a law enforcement officer has stopped a person for questioning pursuant to this section and reasonably suspects that such officer's personal safety requires it, such officer may frisk such person for firearms or other dangerous weapons. If the law enforcement officer finds a firearm or weapon, or other thing, the possession of which may be a crime or evidence of crime, such officer may take and keep it until the completion of the ques-

tioning, at which time such officer shall either return it, if lawfully possessed, or arrest such person."

The Judicial Council Notes to 22-2402 cite *Terry v. Ohio* for justification for and limitations applicable to the power to search a person before an arrest. It cites in part:

"When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."

A search for weapons in the absence of probable cause to arrest must be strictly circumscribed by the exigencies which justify its initiation. See *Warden v. Hayden*, 387 U.S. 294, 298-300, 18 L. Ed. 2d 782, 87 S. Ct. 1642 (1967). The search must be limited to that which is necessary for the discovery of weapons that might be used to harm the officer or others nearby. It may be characterized as something less than a "full" search, although it remains a serious intrusion.

A search under K.S.A. 1990 Supp. 22-2402 is justified if a law enforcement officer has prior knowledge of facts, observes conduct, or receives responses to the limited interrogation under subsection (1) that would cause the officer, in light of his experience, to reasonably suspect his personal safety is in danger. *State v. Jackson*, 213 Kan. 219, 225, 515 P.2d 1108 (1973).

"The only justification of a *Terry* search is the protection of police officers and others nearby." *State v. Webb*, 13 Kan. App. 2d 300, 302, 769 P.2d 34 (1989). "Whenever a police officer accosts a person and restrains his freedom, he has 'seized' that person." *State v. Epperson*, 237 Kan. 707, 712, 703 P.2d 761 (1985). A seizure, however, is only prohibited by the Fourth Amendment if it is unreasonable. *United States v. Sharpe*, 470 U.S. 675, 682, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985). The reasonableness of a search is determined by the trial court from the case facts and circumstances. *State v. Jackson*, 213 Kan. at 225 (citing *Ker v. California*, 374 U.S. 23, 10 L. Ed. 2d 726, 83 S. Ct. 1623 [1963]).

In *Terry*, the court propounded a two-pronged test to assess the reasonableness of an investigative stop falling short of a full

arrest. A court must determine whether the officer's conduct was justified at its inception and whether it was reasonably related in scope to the circumstances that justified the interference in the first place. 392 U.S. at 20. Kansas applies the same test. *State v. Baker*, 239 Kan. 403, 407, 720 P.2d 1112 (1986).

In the instant case, Officer Caster's conduct was justified at its inception, which Nugent appears to concede. Caster was told an armed robbery had occurred just one and a half to two minutes earlier and a black man was fleeing on foot in the Southgate parking lot. In addition, none of the businesses were open in the area, Nugent was the only person seen in the lot, and his was the only vehicle around. He had a "worried" look on his face when Caster saw him. Nugent's only argument is that it was unreasonable for Caster to display his shotgun, order him to the ground, and handcuff him. Thus, the remaining issue is whether the second prong of the test was met.

The length of detention is a factor used to determine whether a seizure is so minimally intrusive as to be justifiable on reasonable suspicion. *United States v. Sharpe*, 470 U.S. at 685. In the instant case, the detention made with reasonable suspicion was only about 30 seconds. After that time, Wages identified Nugent as the robber, giving the police probable cause to arrest Nugent.

There is little guidance to determine what factors, beyond the length of detention, should be considered when determining whether the seizure can be justified. It appears Kansas permits handcuffing of a suspect during a *Terry* stop in light of *State v. Baker*, 239 Kan. 403.

In *Baker*, two Wichita police officers, Agnew and Tenbrook, were parked in separate patrol cars several blocks away from a gas station that had just reported an armed robbery. Both responded and traveled different routes to the station. En route to the station, Agnew encountered a white two-door Chevrolet Cavalier approaching from the opposite direction. Agnew shined his alley light on the car as they passed one another. He saw the car was occupied by three black males, each dressed in dark clothing. The dispatcher had described the robbers as two black males wearing black jackets and blue jeans.

Agnew turned his car around to stop the Cavalier and check its occupants. In the meantime, the car had turned at the next

intersection, driven a short distance, and parked at a curb, shutting off its lights. Agnew pulled up behind the car and turned off his emergency lights and instructed the occupants to get out of the car. As they got out of the car, Tenbrook arrived and patted them down and handcuffed them. While Tenbrook was handcuffing the men, Agnew looked inside the car and saw a $10 bill lying between the seat and the door. On the passenger side of the car, he saw a large wad of money stuffed under the passenger's seat and the barrel of a firearm protruding from under the seat. The men were then arrested. 239 Kan. at 405.

The appellants in *Baker* appealed their convictions, claiming the initial stop, their arrest, the search of the vehicle, and the admission of testimony and physical evidence were all improper under the Fourth Amendment. 239 Kan. at 406. The court held that the initial stop and subsequent arrest were legal and affirmed the trial court's refusal to quash their arrest and suppress the evidence obtained incident to arrest. 239 Kan. at 409. The court in *Baker*, however, did not focus on the manner of the seizure. Instead, the issue before the court was whether the facts known to Agnew were insufficient to constitute the basis for a reasonable and articulable suspicion that the appellants had committed, were committing, or were about to commit a crime. 239 Kan. at 408.

In *State v. Boone*, 220 Kan. 758, 556 P.2d 864 (1976), a Town and Country Market in Wichita, Kansas, was robbed at approximately 2:15 a.m. by two masked individuals. One wore a fatigue jacket and what appeared to be a gas mask and carried a sawed off shotgun. The other person wore a ski mask. Two police officers patrolling the area had seen the defendant leaving his house in that same area at about 2:00 a.m. They went to the defendant's house at about 3:00 a.m., parked, and waited. In a few minutes, the defendant returned in his station wagon and was startled when the officers turned their lights on him as he drove by. He stopped and immediately got out and stood by his car. The officers then got out of their car and approached defendant with guns drawn. Officer Knard advised defendant there had been a robbery, told him to put his hands on the car, and proceeded to pat him down for weapons. Meanwhile, the other officer shined his flashlight into defendant's car and saw two bills paperclipped together and what looked like a gas mask on the back floorboard. The officer

told Officer Knard, who then handcuffed defendant and advised him of his rights.

On appeal, the defendant contended that, when the officers confronted him with guns drawn, it constituted an illegal arrest, since at that time they had only articulable suspicion, not probable cause.

Disagreeing, the court stated:

"When a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. *City of Garden City v. Mesa*, [215 Kan. 674, 678, 527 P.2d 1036 (1974)]. There can be a 'seizure' of a person in the Fourth Amendment sense even where there is no formal arrest. *Terry v. Ohio*, [392 U.S. at 16].

" 'Arrest' as defined in the Kansas Code of Criminal Procedure contemplates more than the temporary restraint of a person by a law enforcement officer. Rather, it is the restraint of a person in order that he or she may be forthcoming to answer for the commission of a crime. See [K.S.A. 1975 Supp. 22-2202(3) and (7)].

"When Officers Meyers and Knard initially restrained the appellant, we believe their purpose was to temporarily detain him so as to investigate possible criminal behavior. Officer Meyers testified that Boone was initially restrained before he went around the car and looked into the windows, but that 'we didn't place him under arrest at that time. . . .' It was only after the officers observed items which appeared to implicate the appellant in the robbery that he was handcuffed and read his rights. It was at that point that his restraint satisfied the statutory definition of arrest." 220 Kan. at 764.

We have found no other Kansas cases discussing handcuffing or pointing a gun at the subject of a *Terry* stop. There are, however, a number of other jurisdictions cited by the State where appellate courts held that handcuffing a suspect or pointing a gun at a suspect during a *Terry* stop was not unreasonable and did not convert the stop into an arrest.

The issue of whether police had actually made an arrest without probable cause instead of a *Terry* stop, due to the manner in which they confronted and detained defendant and his companions, was addressed in *United States v. Merritt*, 695 F.2d 1263 (10th Cir. 1982). The *Merritt* court chose not to focus on the degree of force used by police to determine the reasonableness of a stop. Those courts which do so, the court stated, "apparently assumed that at some point the show of force made by police conducting a stop becomes so great as to render it an arrest,

regardless of the justification that may exist for the degree of force used." 695 F.2d at 1274. The court reasoned, "It seems to us that to focus the analysis in this manner diverts attention from the court's true concern in any Fourth Amendment case— whether the police conduct, in light of all the circumstances, was reasonable." 695 F.2d at 1274.

A number of police were involved in the stop of Merritt. The SWAT team had been called in by Colorado police in an effort to locate an individual suspected of murder, who was believed to be heavily armed. After checking a residence he was known to frequent, police were told he was not there but would return soon. Police then noticed a white truck circle the block, and, upon returning, pull to the curb. The occupants crouched down in the truck. Two officers pulled their cruiser up behind the suspect's vehicle, which was parked on the street. The officer driving the cruiser got out of it, rested a shotgun on the top of the car, and told defendant and the other two occupants of the truck to get out. At the same time, his partner approached the vehicle from the other side. 695 F.2d at 1267. Meanwhile, a third officer had walked to a point directly across the street from the truck. He also held a shotgun on the three suspects. The police ordered the suspects to the back of the truck. They were met by police, who told them to freeze. Shortly, there were 6 or 7 police cruisers at the scene and about 12 to 15 officers, 2 or 3 of whom carried shotguns. 695 F.2d at 1267. After the suspects identified themselves, police searched the truck with a flashlight and found a loaded .22 revolver protruding from under the driver's seat. Merritt stated the gun was his, at which time he was arrested. 695 F.2d at 1267. In examining the reasonableness of the seizure, the court found the police conduct was justified by the need to ensure their own protection. 695 F.2d at 1272.

The same issue was examined in *People v. Weeams*, 665 P.2d 619 (Colo. 1983). About 1:15 a.m., Aurora police received a call reporting an armed robbery. The dispatchers described the suspects as two black males, 25 to 30 years old, approximately 5 feet 9 inches tall, wearing dark clothing and white tennis shoes. The suspects were reportedly armed. About 15 minutes later, Aurora police were notified of a second armed robbery just two and one-half blocks from the first robbery. In that robbery, one

person was killed and another wounded. The suspects were described as two black males.

At 1:46 p.m., Officer Sloan of the Aurora Police Department entered the robbery area. He saw only two other vehicles, each occupied by a single white male. At the crime scene, he saw a vehicle occupied by two black males in their 20's, wearing dark clothing. After following them for several blocks, he directed the vehicle to stop, using his public address system. The officers then called for back-up assistance and put the spotlight on the car. The vehicle's driver was ordered out of the car. Sloan searched him for weapons, requested identification, and asked for an explanation of his presence in the area. The driver's responses were inconsistent and suspicious. After the back-up officers arrived, Weeams was ordered out of the car, frisked for weapons, and handcuffed. A check of the car for further suspects revealed a sawed-off shotgun and a pistol in plain view on the back seat. Police also removed a wallet from Weeams that belonged to a victim of the second robbery. Both men were arrested. 665 P.2d at 621.

Weeams claimed police exceeded the permissible scope of the investigatory stop when the officer handcuffed Weeams, making it an arrest without probable cause. The Colorado Supreme Court reversed the trial court's ruling that the police exceeded the permissible scope of the investigative stop. They reasoned that police conducting an investigatory stop may use that amount of force which is reasonably related in scope and character to ensuring their safety during the period of detention. The court found that a detainee's belief he is not free to leave does not transform a stop into an arrest. The *Weeams* court, 655 P.2d at 622 (quoting *United States v. Merritt*, 695 F.2d at 1274), stated:

" 'We should not ask whether the force used was so great as to render it an arrest but, instead, whether the force used was reasonable. Whenever the police confront an individual reasonably believed to present a serious and imminent danger to the safety of the police and public, they are justified in taking reasonable steps to reduce the risk that anyone will get hurt. They should not be constrained in their effort to reduce the risk of injury or death simply because the facts known to them create a reasonable suspicion, but do not rise to the level of probable cause.' "

The court in *United States v. Bautista*, 684 F.2d 1286 (9th Cir. 1982), also found the use of handcuffs during a *Terry* stop did

not necessarily convert the stop into an arrest without probable cause. In *Bautista*, California police made a *Terry* stop of two armed robbery suspects who were on foot. As police got out of their car, Bautista approached them and volunteered he had just gone to a nearby house and asked the woman answering the door to call a cab. The officers frisked the men, and, although they found no weapons, both were handcuffed while one officer went to the house to check Bautista's story. The officer testified he had noticed needle tracks on the suspect's arm and, for his fellow officer's safety, handcuffed the suspects. After verifying Bautista's story, police questioned the suspects separately. Their answers were inconsistent and suspicious. The officer then arrested the suspects. 684 F.2d at 1288.

In denying the claim that the handcuffing constituted arrest without probable cause, the court stated: ,

"On the one hand, handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop. On the other hand, police conducting on-the-scene investigations involving potentially dangerous suspects may take precautionary measures if they are reasonably necessary. The purpose of the *Terry* frisk is to allow the officer to pursue his investigation without fear of violence." 684 F.2d at 1289.

Courts in other jurisdictions consistently determine whether the manner of a seizure exceeds the scope of the *Terry* stop by looking at the reasonableness of the seizure under the circumstances. See *U.S. v. Crittendon*, 883 F.2d 326 (4th Cir. 1989) (police hand-cuffed a suspect during a *Terry* stop; the court held brief, although complete, deprivations of a suspect's liberty do not convert a stop and frisk into an arrest if the methods of restraint used are reasonable under the circumstances); *U.S. v. Hastamorir*, 881 F.2d 1551 (11th Cir. 1989) (under the circumstances, it was reasonable for police to handcuff suspect); *United States v. Kapperman*, 764 F.2d 786 (11th Cir. 1985) (officer drawing his gun and directing two passengers to get out of the vehicle not unreasonable); *United States v. Bautista*, 684 F.2d at 1289; *United States v. Jackson*, 652 F.2d 244 (2d Cir. 1981) (officer acted reasonably when he drew his gun on approaching vehicle of armed robbery suspects); *People v. Weeams*, 665 P.2d at 622; *People v. Waddell*, 190 Ill. App. 3d 914, 546 N.E.2d 1068 (1989) (the handcuffing

of defendant did not transform the *Terry* stop of defendant into an arrest).

In *People v. Finlayson,* 76 App. Div. 670, 675, 431 N.Y.S.2d 839 (1980), when an officer stopped armed robbery suspects, he got out of his police car carrying a shotgun, approached the suspects' car pointing the shotgun at the two occupants, and ordered them to place their hands on the dashboard of the car. When the suspects complied, the officer radioed for a description of the armed robbers. 76 App. Div. at 673. The court held the appellant's car was properly stopped, and the police conduct was reasonably related to the circumstances surrounding the encounter. 76 App. Div. at 681.

In the instant case, it was reasonable under the circumstances for Caster, who was alone, to get out of his patrol car with a shotgun pointed at Nugent, order him to the ground, and handcuff him before searching for weapons. When Nugent got out of the van, the left side of his body was concealed. Based on dispatched information, it was reasonable for Caster to believe Nugent was armed. Caster had a reasonable and articulable suspicion to detain and question Nugent since a robbery had occurred about two minutes before, a black man was described as fleeing on foot, Nugent is black and was the only person in the immediate vicinity, and he had a worried look on his face.

Nugent claims that Caster admitted he went beyond the limited stop and frisk contemplated by *Terry* and K.S.A. 1990 Supp. 22-2402, instead of making a full-blown arrest for his own safety. This court's review of the record, however, shows Caster testified that the manner of his search was done for his personal safety and was in accordance with his training from the police academy.

K.S.A. 1990 Supp. 22-2402 permits an officer to search a person for dangerous weapons if the officer believes his or her personal safety requires it. This allows the officer to take the precautions the officer believes are reasonably necessary to protect his safety while he or she makes the search and briefly detains the suspect. The trial court did not err in refusing to suppress the eyewitness identification and evidence found in the search subsequent to arrest. When a defendant challenges the admissibility of evidence on the basis it was obtained by an unlawful search and seizure, the State has the burden of proving that the search and seizure

was lawful. *State v. Danko*, 219 Kan. 490, 494, 548 P.2d 819 (1976). In the instant case, there is sufficient evidence for the court to have found the State sustained its burden in establishing the reasonableness of the search.

Affirmed.