**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 30, 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

FABIAN BURCIAGA-BURCIAGA,
a/k/a/ JOSE PEREA,

Defendant-Appellant.

No. 05-2003

District of New Mexico

(D.C. No. CR-03-2177 JB)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, Chief Circuit Judge, **EBEL**, and **McCONNELL**, Circuit Judges.

---

Defendant-Appellant Fabian Burciaga-Burciaga appeals the district court's denial of his motion to suppress evidence discovered during a so-called felony stop performed by officers of the Albuquerque Police Department at a Sonic drive-in restaurant. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we AFFIRM.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

I.    Background and Facts

Mr. Burciaga's maroon Cadillac Escalade first came to the attention of the Albuquerque Police Department (APD) on October 5, 2003, when APD officer Jeremy Bassett and DEA agent Kevin Small were stationed at a Flying J truck stop conducting "consensual encounters." Agent Small saw a man leave the truck stop in a maroon Cadillac Escalade. The Escalade returned to the Flying J approximately one hour later, circled the parking lot, and parked. A man, later identified as James Estrada, approached the vehicle at a brisk pace and reached inside, whereupon the door opened and the driver handed him a white object the size of a billiard ball. Immediately after the exchange, a green pickup truck occupied by two individuals pulled up next to the Escalade so that the drivers were next to each other. The drivers had a heated argument before driving away in different directions.

After the two trucks left the Flying J, Officer Bassett followed Mr. Estrada into the truck stop's restaurant, where his wife was eating. Mr. Estrada and his wife abruptly left the building. In the parking lot, agent Small stopped Mr. Estrada. Officer Bassett joined them and asked for consent to perform a pat-down search of Mr. Estrada, which he granted. During the pat-down search, officer Bassett felt a round object the size of a billiard ball. With Mr. Estrada's permission, the officer removed the item, which turned out to be approximately

five grams of cocaine.

In response to questions from the officers, Mr. Estrada said that he got the cocaine from the driver of the Escalade, whom he identified as "Fabian." He claimed to be the middleman in a drug deal between the people in the Escalade and the people in the green pickup truck. When the officers questioned him about the occupants of the green pickup truck, Mr. Estrada launched into a "ramble," telling the officers that one of the occupants of one of the two vehicles was involved in a homicide of a police officer in Los Lunas, New Mexico or "somewhere down south." Based on this information, Officer Bassett told a police dispatcher that an occupant of one of the vehicles was possibly wanted for a homicide.

Police dispatch then broadcast an "attempt to locate" (ATL) for the maroon Escalade and the green pickup truck. The ATL included the report of a possible homicide, a description of the green truck, and a description of the Escalade including make, model, color, license plate number, and wheel rims. The ATL also identified the Escalade's driver as a "Spanish male adult" with a shaved head and a small pony tail. Although Officer Bassett testified that his report did not link the alleged homicide to either vehicle, APD officer Jason Harvey, who responded to the call, testified that the ATL linked the homicide to an occupant of the green pickup truck. After Officer Harvey arrived at the Flying J, Officer

-3-

Bassett told him that "there was a suspect in one of the vehicles that was possibly involved with a homicide." App. 233. Officer Bassett did not give officer Harvey the details of the homicide or tell him that the alleged victim was a police officer. The ATL did not result in a stop of the Escalade or the green pickup on October 5.

A few days later, on October 8 or 9, Officer Harvey stopped a vehicle that matched the ATL's description of the Escalade from the Flying J, except that it had no license plate. Harvey conducted a "felony stop" with other officers in three or four police cars. The officers trained their vehicles' headlights on the vehicle, pointed their guns at the driver, and ordered him to drop his keys, exit the car, and approach officer Harvey, who then ordered him to his knees, handcuffed him, and placed him in his squad car. After the felony stop, Officer Harvey realized that the driver was not the man from the Flying J. After asking the driver's permission, he searched the vehicle.

Around 5:00 p.m. on October 11, Officer Harvey saw another Escalade in oncoming traffic that matched the description of the truck at the Flying J. Because the windows were tinted, he could not identify the driver or determine how many people were inside. Unable to turn around quickly enough to pursue the Escalade, Officer Harvey requested an ATL on the vehicle "in reference to narcotics and possibly that one of the occupants might be involved with a

homicide." App. 194. At approximately 9:30 p.m. on the same evening, while Officer Harvey was eating dinner with other officers, he heard a report that the Escalade was at a Sonic drive-in one block away. As Officer Harvey rushed to the Sonic with the other officers, he told them that "an occupant may have been involved with a homicide." App. 196.

The officers arrived at the Sonic in five squad cars, saw the Escalade, and positioned their vehicles to intercept it. As the Escalade left the Sonic, the squad cars converged on the vehicle. The officers created a "wall of light," intended to blind the occupants of the Escalade, by turning on their headlights and spotlights. They drew their guns and trained them on the vehicle. (One officer was armed with an AR-15 rifle and stationed outside a nearby building.) Using a loudspeaker, an officer told the driver that he was a suspect in a violent crime and directed him to turn the car off, drop the keys outside the vehicle, open the vehicle with his left hand, and get out slowly. When the driver, who turned out to be Mr. Burciaga, exited the Escalade as directed, the officer ordered him to reach behind his neck, pull up his shirt, and turn around so the officers could check for weapons. He was then ordered to walk backwards toward the sound of the officer's voice, drop to his knees, and put his hands behind his head. When Mr. Burciaga was on his knees with his hands behind his head, officer Harvey handcuffed him, patted him down, and put him in the back seat of his squad car.

Once Mr. Burciaga was in Officer Harvey's squad car, Officer Terry called Sgt. Bassett and confirmed that the driver of the Escalade at the Flying J had a shaved head and a small pony tail. Officer Terry told Mr. Burciaga that his car matched the description of a car involved in a drug transaction, but he was not wanted in connection with a homicide. Officer Harvey then asked permission to search the Escalade for firearms and drugs, which Mr. Burciaga granted. Officer Harvey did not find a weapon in the Escalade, but he found approximately one pound of crack cocaine and $3,500 in the center console.

On March 23, 2004, the grand jury returned a superseding indictment charging Fabian Burciaga-Burciaga, a/k/a/ Jose Perea, with three counts: (1) possession with intent to distribute less than 500 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); (2) distribution of less than 500 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and (3) possession of more than 50 grams of crack cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).[2] [App. 63] Mr. Burciaga filed a motion to suppress the crack cocaine discovered during the search of his vehicle on October 11, 2003. The court announced at the evidentiary hearing that it would deny the motion. In an order filed April 13, 2004, the court memorialized its ruling and

[2]The original indictment, returned on October 29, 2003, charged "Jose Perea" with possession of more than 50 grams of crack cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

-6-

noted that it would issue an additional opinion explaining its rationale.

On September 10, 2004, Mr. Burciaga entered a conditional guilty plea to Count III of the superseding indictment—possession of more than 50 grams of crack cocaine with intent to distribute—reserving the right to appeal the court's denial of his motion to suppress. Mr. Burciaga filed a notice of appeal on January 3, 2005. On January 24, 2005, the district court issued a memorandum opinion explaining its denial of the motion to suppress.

II.    Analysis

The district court found that the officers conducted a valid *Terry* stop of Mr. Burciaga's vehicle because it had been identified in a narcotics transaction. It held that the officers reasonably believed that the driver of the vehicle might be wanted in a homicide investigation; therefore, the use of firearms did not "escalate the detention into a formal arrest requiring probable cause." App. 67. The court then found that Mr. Burciaga consented voluntarily to the search, reasoning that the officers did not entice or mistreat Mr. Burciaga, the atmosphere was not coercive because the officers had holstered their guns and asked permission to search the vehicle, and Mr. Burciaga did not object during the search. *Id.* The district court did not reach the government's claims that the stop was justified by probable cause or that the drugs would have been discovered inevitably. We review the district court's factual findings for clear error, viewing

the evidence in the light most favorable to the government. We review de novo the court's legal ruling that the officers acted reasonably and that Mr. Burciaga consented voluntarily to the search. *See United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993).

Mr. Burciaga concedes that the initial stop of his vehicle was justified by the officers' reasonable suspicion that the driver had been involved in a felony. *See United States v. Hensley*, 469 U.S. 221, 229 (1985) (reasonable suspicion that the suspect "was involved in or is wanted in connection with a completed felony" justifies an investigative stop). The question is whether the particular facts of the vehicle stop, most notably the display of firearms by several officers, transformed the stop into an arrest requiring probable cause. *See United States v. Perdue*, 8 F.3d at 1461 (citing *Michigan v. Summers*, 452 U.S. 692, 700 (1981)). Officers are permitted to take precautions "reasonably necessary to protect their personal safety and to maintain the status quo" when making a *Terry* stop. *Id.* at 1462 (quoting *Hensley*, 469 U.S. at 235). While the use of guns during a *Terry* stop normally elevates the seizure to a formal arrest, the display of firearms is permissible without probable cause if the officers "reasonably believe that [firearms] are necessary for their protection." *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir. 1982); *see also United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 (10th Cir. 1998) (explaining that the use of firearms during a stop is

"justified only by probable cause or when 'the circumstances reasonably warrant such measures'") (quoting *Perdue*, 8 F.3d at 1462).

Mr. Burciaga maintains that the officers' use of guns during the felony stop went beyond the limits of a *Terry* stop because they had no articulable reason to suspect that he was armed and dangerous. He argues that Mr. Estrada's allegation regarding the homicide in Las Lunas was too vague to support a reasonable belief that Mr. Burciaga possessed a gun at any particular time. He argues further that the passage of time between the original ATL on October 5 and his arrest at Sonic on October 11, during which the officers failed to investigate the alleged homicide, made reliance on the Estrada statement particularly unreasonable. Even if the officers had a reasonable belief that he was armed and dangerous, Mr. Burciaga argues that the use of force went beyond measures reasonably necessary for their protection. Finally, Mr. Burciaga contends that we must remand for a determination of whether his consent to the search was tainted by the illegal arrest. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1053–55 (10th Cir. 1994) (explaining that when consent to a search follows a Fourth Amendment violation, the government must prove that the consent was voluntary and that the taint of the constitutional violation was purged by intervening events); *see also United States v. Maez*, 872 F.2d 1444 (10th Cir. 1989) ("If the consent is not sufficiently an act of free will to purge the primary taint of the illegal arrest, it

must be suppressed as fruit of the poisonous tree.").

The government responds that the original ATL and the conversation with Sgt. Bassett at the Flying J gave Officer Harvey reason to believe that the driver of Mr. Burciaga's truck was armed and dangerous. The government argues that the degree of force used was reasonable in the circumstances, noting that the officers put their weapons away as soon as they placed Mr. Burciaga in a police car and determined that no one else was in the Escalade.

The display of firearms during a vehicle stop is permissible if the officers have specific information indicating that an occupant of the vehicle is armed and dangerous. In *United States v. Merritt*, 695 F.2d 1263 (10th Cir. 1982), Denver police officers kept shotguns trained on the defendant and two others during a vehicle stop. We held that the use of firearms was reasonable under the circumstances because the suspect was a fugitive wanted for murder in Texas and reported to be armed and dangerous, the police had confirmed that he was staying at a house near the place of the stop, a search of the house uncovered a variety of weapons, and the stop occurred in the middle of the night. *See id.* at 1272.

An informant's tip that a vehicle's occupants may be armed can also justify the use of weapons, particularly when there is reason to believe that other criminal conduct is involved. In *United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 (10th Cir. 1998), an informant reported that the defendant was transporting a

large amount of cocaine to Las Vegas in a particular car, and one of the occupants might be armed. *Id.* at 1237. After following the car for approximately an hour and confirming the direction of travel, police performed a felony stop. *Id.* at 1238. We found the officers' display of weapons to be reasonable under the circumstances because the tip gave them reasonable suspicion that the occupants might be armed, provided probable cause to believe that the defendant was transporting cocaine, and officers conducted the stop at night on the side of a highway. *Id.* at 1240.

Like the officers in *Merritt* and *Gama-Bastidas*, the officers who performed the felony stop on Mr. Burciaga's vehicle had an articulable reason to believe that Mr. Burciaga might be armed and that their safety was at risk. The encounter at the Flying J gave the officers reasonable suspicion that the driver of the Escalade was involved in a drug sale. Suspicion of drug trafficking is not sufficient to justify the use of guns and handcuffs during a *Terry* stop. *United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994) ("[T]he naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a *Terry* stop."). But the government here relies on more than the mere suspicion of drug trafficking. After confirming that the Escalade was involved in a drug transaction, Sgt. Bassett heard Mr. Estrada state that the Escalade's driver was a large-scale dealer, the occupants of the Escalade and the

-11-

green pickup truck were involved in a drug-related dispute, and one of them might have been involved in a homicide.

Officer Harvey's belief that the driver of the Escalade, as opposed to the green pickup, might be armed was not unreasonable. The original ATL apparently connected the homicide to an occupant of the green pickup truck, but when Officer Harvey arrived at the Flying J, Sgt. Bassett told him that an occupant of either one of the trucks might have been involved in the homicide. Officer Harvey therefore had no reason to think that Mr. Estrada's statement applied only to the green pickup truck.

While the contents of Mr. Estrada's allegation were vague, reasonable belief does not require absolute certainty that the suspect is armed. In *United States v. Perdue*, 8 F.3d 1458, 1462–63 (10th Cir. 1993), the defendant was seen driving toward an isolated house suspected to be a drug manufacturing site. The defendant turned around and began to drive away when he saw that a large number of officers were executing a search warrant on the house. Two officers followed and stopped the vehicle, drawing their guns and ordering the defendant onto the ground while they searched the car for weapons. We held that the display of weapons was reasonable because the defendant was clearly driving toward the house, guns had been discovered during the search of the house, the stop was in a remote area, and only two officers made the stop. In this case, Mr.

Estrada's statement about the homicide in Las Lunas, while vague, gave the officers as much reason to believe that the driver was armed as the defendant's behavior in *Perdue*.

The officers' conduct during the felony stop was appropriate in relation to the perceived threat. The measures taken during a *Terry* stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and may not go beyond what is necessary for officer safety. *United States v. King*, 990 F.2d 1552, 1563 (10th Cir. 1993) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous. The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat. The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

III.    Conclusion

The use of firearms was reasonable under the circumstances and therefore did not transform the vehicle stop into a formal arrest requiring probable cause.

The denial of Mr. Burciaga's motion to suppress is AFFIRMED.

Entered for the Court

Michael W. McConnell
Circuit Judge