[Cite as *State v. Chappell*, 2020-Ohio-2956.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28598 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-1867 |
| | : | |
| SEAN CHAPPELL | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of May, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
	Attorney for Plaintiff-Appellant

CHRISTOPHER W. THOMPSON, Atty. Reg. No. 0055379, Public Defender's Office, 117 South Main Street, Suite 400, Dayton, Ohio 45422
	Attorney for Defendant-Appellee

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} The State of Ohio appeals from the trial court's order granting Sean Chappell's motion to suppress. Chappell had been indicted on one count of improper handling of a firearm in a motor vehicle. The trial court concluded that the State had failed to establish that the firearm found inside Chappell's vehicle was in plain view exception to the search warrant requirement. We affirm the trial court's order.

{¶ 2} On July 16, 2019, Chappell was indicted on one count of improper handling of a firearm in a motor vehicle (loaded, no license), in violation of R.C. 2923.16(B), and the trial court entered a plea of not guilty on his behalf. On August 12, 2019, Chappell filed a motion to suppress, arguing that the police unlawfully detained and searched him and his automobile without reasonable suspicion or probable cause.

{¶ 3} A hearing was held on the motion to suppress on September 30, 2019. The evidence presented at the suppression hearing was as follows.

{¶ 4} Detective Tyler Orndorff of the Dayton Police Department ("DPD"), who was a "drug detective" assigned to the "Narcotics Bureau, Street Crimes, Nights Unit," testified that on the afternoon of June 6, 2019, he and Detective Zach O'Diam were involved in "a crime blitz" targeting violent crime areas. There had been a recent homicide near the DeSoto Bass area, and he and O'Diam were assigned in that area; they were in plain clothes and in an unmarked vehicle. According to Orndorff, their purpose during the crime blitz was to conduct surveillance of individuals they believed might be selling narcotics and/or in possession of firearms, especially in and around the DeSoto Bass area, due to the recent violent crime there.

{¶ 5} Orndorff testified that, on June 6, 2019, he and O'Diam witnessed a blue

Chevy Malibu on Clement Avenue that was parked next to a home that appeared to be vacant. This was significant to the officers because, in Orndorff's experience and training, he had witnessed numerous drug activities occur in abandoned homes. Orndorff testified that he concluded that the home where the Malibu was parked was abandoned because the shades were closed and the grass was overgrown.

{¶ 6} Orndorff testified that he and O'Diam were able to observe the features, clothing, and hairstyles of the driver and passenger in the vehicle. The vehicle left the vacant home after they had observed it for about ten minutes, travelling south on Clement and turning east on Weaver Street. Orndorff testified that the vehicle began to "pick up speed" in a residential area and travel in excess of the posted speed of 25 miles per hour. Orndorff testified that the officers were unable to keep up with the vehicle, but they saw it turn south onto Trieschman Avenue; they lost sight of the vehicle for approximately two minutes, and then observed it again on Miami Chapel Road, in front of "shotgun-style apartments." At that time, they continued to conduct surveillance; the vehicle was "parked facing east on the north side of the curb, so it was parked illegally" on Miami Chapel Avenue.

{¶ 7} Orndorff contacted a uniformed crew to make a stop for the parking infraction and the speeding that he and O'Diam had witnessed. He and O'Diam provided the plate number, the make, model, and color of the vehicle, a description of the driver, and the number of persons inside the vehicle. Sgt. Ryan Halburnt subsequently arrived in a marked cruiser and made a traffic stop of the vehicle.

{¶ 8} Orndorff testified that while Halburnt was initiating the traffic stop, Orndorff observed Chappell approaching the vehicle on foot; Orndorff recognized Chappell as the

driver of the vehicle. According to Orndorff, in the course of his surveillance of the vehicle, he had seen that the driver had "short, twisty braids, or almost small, short dreads"; Orndorff was "100 percent able to identify [Chappell]" at the traffic stop by "his hair, his size, his height, color of his t-shirt."

{¶ 9} A cruiser camera video from Halburnt's cruiser was played for the court. Orndorff identified Chappell in the video as the person in a white t-shirt approaching the parked Malibu. Halburnt approached Chappell. Orndorff identified himself on the video as the person exiting the passenger side of the unmarked cruiser and crossing in front of Halburnt's cruiser. Orndorff testified as follows about O'Diam's approach of the passenger side of Chappell's vehicle, as depicted in the video:

[PROSECUTOR] Q. And the individual in the black vest, is that * * * Det. O'Diam?

A. Yes, it is.

Q. And when he opens the door and pulls that passenger out, does he relay information to you?

A. Yeah, he - - at some point, he relays information that there is a firearm inside the vehicle. I believe that he see [sic] it - - he seen it before he - -

[DEFENSE COUNSEL]: Objection to - -

A. - - opened the door.

[DEFENSE COUNSEL]: - - everything that O'Diam told him.

THE COURT: I believe in a motion to suppress, there's some - - is it special? Hearsay is generally admissible, right, on the motion to

suppress? * * *

[PROSECUTOR]:   Yes, Your Honor. * * *

THE COURT:   Plus, this is kind of – it's just, I, police - -

[DEFENSE COUNSEL]:   * * * I believe it's up to the discretion of the Court, but if he's just setting the scene up, that is something that is acceptable.   But for the purpose of setting the scene, not for the truth of whether or not O'Diam saw anything.

THE COURT:   Overruled, with that understanding.

BY [PROSECUTOR]:

Q.   So he related information to you about a location of a gun; did you later see that gun that he was talking about?

A.   I did.

Q.   And can you describe where you saw it?

A.   * * * It was in the driver's side door, in the compartment of the driver door.

Q.   And from the vantage point of where O'Diam is, would that have been visible to him - -

A.   Yes, it would be.

Q.   - - based off of what - - where you saw the gun?

A.   That is correct.

{¶ 10} On cross-examination, Orndorff testified that the officers did not observe anyone approach the vehicle while it was parked near the abandoned home during their prior surveillance of the Malibu.

**{¶ 11}** The cruiser camera video was played again for the court, and Orndorff identified Halburnt's voice in the video. When asked to describe his own actions in the video, Orndorff responded that due to Chappell's actions, which included "beginning to pull away" and not allowing Halburnt to conduct a pat-down, he (Orndorff) went to assist Halburnt with the traffic stop. Orndorff testified that he was not familiar with Chappell and did not have any information that Chappell was armed and dangerous.

**{¶ 12}** Orndorff identified O'Diam in the video, the following exchange occurred:

[PROSECUTOR] Q. * * * Now * * * so this is a traffic complaint. Do you know why [O'Diam] walks to the automobile to extract the passenger?

A. Well, if you're referring to why he removed the passenger, the passenger was removed because of the gun that was inside the vehicle - -

Q. Okay.

A. - - that was in plain view.

Q. At what point was the gun seen?

A. I can't speak to when Det. O'Diam saw it, but I'd assume that he saw it as soon as he walked up to the vehicle because from my vantage point, when I looked inside the vehicle, it was readily available and at hand in the driver compartment - -

Q. Okay.

A. - - side door there.

Q. Now - - when you looked in the vehicle, correct?

A. Yes, when I looked.

Q. But we have no idea, at this point - - okay. First of all, we agree

he is not in the uniform of the day.   He is not in a typical police uniform, correct?

A.   Correct.

Q.   So is he assisting in a traffic stop right now?

A.   Yes, he would be.

Q.   * * * Is that ordinary, for undercover to assist?

A.   It does happen quite frequently, yes.

* * *

Q.   - - it happens because you call ahead because you are suspicious of an individual, correct?

A.   Sure, yeah. I believe that.

Q.   * * * You have a hunch. There's a hunch something's going on, right?

A.   Yeah.   Yeah.

Q.   And then what you do is you tell a uniform crew to do a traffic stop, and then you explore that hunch a bit more, correct?

A.   I believe that's fair.

Orndorff also testified that Halburnt was wearing a microphone in the course of the traffic stop, that he (Orndorff) was not, and that his and O'Diam's vehicle did not have a camera.

{¶ 13} On redirect examination, Orndorff testified that Chappell was cited for the parking violation; Chappell was detained for the "traffic stop, both the speeding and the parking infraction," and not based upon the officers' observation of him by the abandoned home.   No contraband was found on Chappell's person.   Orndorff testified that O'Diam's

vest at the scene identified him as a member of law enforcement and that O'Diam was no longer employed with the DPD, but was employed as a DEA agent.

{¶ 14} Sergeant Ryan Halburnt of the DPD testified that he had more than 21 years of law enforcement experience and that, in the course of his work, he encountered narcotics daily. On June 6, 2019, Halburnt initiated a traffic stop on Chappell's vehicle, based on information from Orndorff and O'Diam that they had observed the vehicle parked for an extended period of time at a vacant house, started to follow the vehicle but lost sight of it, then found it a short time later, parked illegally. Halburnt testified as follows:

[PROSECUTOR] Q. * * * And what do you see when you get there?

A. When I pulled up, I see a car parked, facing the wrong direction. It's also more than 12 inches from the curb. I see a black male who's the individual right there in the blue sweatshirt, walking towards the vehicle. And as I pull up, he immediately stops and starts to go the other way.

* * *

Q. And so did you believe the individual outside the car to be the driver?

A. Based on what I saw, I thought he was the driver of that vehicle and he was returning to it, yes.

Q. Can you explain some of the reasons why you thought that?

A. The way it was parked, the fact that there was somebody still in the passenger seat, and the fact that he was walking right towards the car. And then when he saw me, he immediately turned around and started to go

the other way.

* * *

A.   There was nobody else outside or around the vehicle.

Q.   So when you first pull up on the scene, you get out of your car and you go to Mr. Chappell.   Is he under arrest at that point?

A.   No, but I was detaining him.   And the fact that he was turning around to walk the other way, I felt like he was about to run, based on my training and experience in that situation.

Q.   * * * And are you familiar with this area?

A.   Yes.

Q.   What is your experience in this area?

A.   I've been a patrolman for 18 years with Dayton.   I've worked the West Patrol my whole career. * * * I've served drug search warrants in that apartment building, I've served multiple drug search warrants around that property, and I've made arrests in patrol as well, in cruisers in that area.

Q.   So when he makes those movements at that point, do you stop him and pat him down?

A.   Yes.   I immediately went to him because in my experience, the quicker I get out to him, the less chance they have to get away.

Q.   And ultimately is he handcuffed?

A.   Yes, because - -

Q.   And can you explain - -

A.   -- as I got to him, he still kept trying to pull away.   I call it verbal

compliance with active resistance. He's saying, I don't understand what you're doing. But the whole time, he's not listening to what I'm asking him to do.

Q. And what was he doing?

A. Starting to pull away. He kept asking questions, what was going on, which is understandable. * * *

Q. And ultimately, * * * when you're patting him down, you don't find any contraband on him or any evidence that we're using in this case; is that right?

A. No, ma'am.

{¶ 15} On cross-examination, Halburnt testified that he issued a parking citation to Chappell for the parking violation he observed, but that he was not there "just for this parking * * * enforcement action"; Halburnt testified that the parking violation was "one thing" in a "long list" of "the totality of the circumstances" for which Chappell was stopped. Halburnt testified that Chappell exited the nearby apartment building before he approached the vehicle.

{¶ 16} The following exchange occurred:

[DEFENSE COUNSEL] Q. So when you approached this car, you were approaching it as though you had a reasonable suspicion that they were involved in drugs or weapons?

A. Some sort of criminal activity, I thought, was happening, yes.

Q. Okay. * * *

A. Especially once he stopped and turned around to walk away

from the vehicle to try to distance himself from the vehicle that we knew he was driving.

Q. * * * You know what a consensual encounter is, correct?

A. Yes, sir, I do.

Q. Now, one of the ways one would communicate that it's not consensual is to turn and walk the other way, correct?

A. I think my activated - - my overhead lights, we all knew at that point it was not consensual.

Q. * * * So you identified yourself * * * to him, that you were focusing on him and not the automobile?

A. Yes.

Q. * * * And * * * the undercover individuals came fairly quickly, correct?

A. Yes, sir.

Q. Did you tell O'Diam? Did you give him any instructions?

* * *

A. No. I was helping them conduct their investigation.

Q. * * * So your traffic * * * stop was a part of their investigation, it just wasn't traffic-related solely?

A. This was not based strictly on the fact that that car was parked illegally. It's the fact that they saw it for [an] extended period of time, that it fled at a high rate of speed, that we think the driver - - now, I want to figure out if he's valid, if he has a license, why he's driving like that * * * why he's

parked illegally. Those are all things that I was considering.'

Halburnt testified that he did not tell O'Diam to remove the passenger from the vehicle.

{¶ 17} On October 24, 2019, the trial court issued a decision captioned, "Decision and Entry Overruling Defendant's Motion to Suppress." The following day, however, it issued an identical decision captioned, "Amended Decision and Entry Granting Defendant's Motion to Suppress." In its decision, the trial court found that encounter between the officers and Chappell was not a consensual encounter, and that this fact was not disputed. The court found that the officers had had reasonable, articulable suspicion that the driver of the blue Chevrolet committed a parking violation. The court found that the driver, Chappell, should have been cited, but not arrested. The court noted that Halburnt seized Chappell, by means of his overhead lights, and that Chappell "was no longer operating the blue Chevrolet" at that time. The court found that, under the totality of the circumstances, Halburnt, who observed the parking violation first hand, "had reasonable and articulable suspicion of a traffic and parking violation, so as to warrant a traffic stop." The court noted that Halburnt also "had a report from a reliable and known source" that Chappell had violated the speeding laws on various streets in the area. Therefore, Chappell's "seizure on scene was lawful while Sergeant Halburnt conducted his investigation and processed a parking law citation."

{¶ 18} The court noted, however, that the conclusion that Sgt. Halburnt had conducted a proper traffic stop and had reasonably detained Chappell did not "completely resolve" the issues; Chappell also asserted that the search of the automobile was improper because Chappell was outside of the automobile when the search occurred.

{¶ 19} In discussing the plain view exception to the warrant requirement, the trial

court determined that, for the doctrine to apply here, the State was required to show that Det. O'Diam's "intrusion" affording the plain view was lawful. In other words, O'Diam "must [have been] in a place where it [was] lawful for him to be when he [saw] the firearm in the driver's side door," and the incriminating nature of the firearm must have been immediately apparent" to O'Diam. The court found that the evidence offered in support of these two requirements presented "a difficult issue" in this case.

{¶ 20} Regarding a lawful intrusion into the vehicle, the court noted that the driver, Chappell, was already out of the car; it was not a situation where an officer saw the firearm as the driver was exiting the vehicle. Rather, O'Diam arguably saw it "as a passenger [was] requested to exit the vehicle." The court observed that O'Diam went to the passenger side of the car "very soon after arriving on scene" and could be seen on the cruiser camera video "almost immediately opening the door." According to Orndorff, it was at this point that O'Diam stated to Orndorff that he saw a firearm in the driver's side door. The court noted that it was unclear whether O'Diam saw the firearm before or after the door was opened, but that this detail may have been "immaterial," because it was reasonable for O'Diam to order the passenger out of the vehicle; thus, whether O'Diam was on the street on the passenger side of the car or lawfully ordering the passenger out of the car, he was in "a lawful place" when he observed the gun.

{¶ 21} The court concluded, however, that Chappell offered "a valid argument" that "the evidence [was] lacking" about when O'Diam saw the firearm and/or how the observation occurred. The court noted that, in O'Diam's absence, Orndorff recounted O'Diam's statement at the hearing, but the court characterized that statement hearsay, in that it was offered for the truth of the matter asserted. "Detective Orndorff said that

O'Diam told him that he saw the firearm in the driver's side door compartment."

{¶ 22} The court recognized that the Rules of Evidence do not apply at a hearing on a motion to suppress, and thus the status of testimony as hearsay did "not per se bar use at an evidentiary hearing on a motion to suppress." Thus, the court had discretion in this area. The court noted that, very shortly after O'Diam's statement to Orndorff, Orndorff Detective verified the report of the presence of a gun. The court found that "there are some indicia of credibility. So the court finds there is evidence to establish that this was a lawful intrusion."

{¶ 23} The Court observed:

The principle authority for the proposition that hearsay is admissible in a motion to suppress hearing is *United States v. Matlock*, [415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)]. In *Matlock*, the United States Supreme Court held that a hearsay statement about consent supported a search. In that case, the Court cited the general rule with respect to receiving hearsay evidence in a suppression hearing. The Court then went on to analyze the out of court declaration situation. The Court analyze[d] to determine the likelihood that the statements were true. The Court found that there was nothing in the record that raised doubt about the truthfulness of the statement or reason to exclude it at the suppression hearing. In that case, the declarant['s] statements were against penal interest and so they carried their own indicia of reliability.

(Footnote omitted.)

{¶ 24} The court concluded that O'Diam's statements were not "against penal

interest" and supported the State's position, were "self-serving," and there was "no objective support of the assertion of O'Diam." Moreover, the State did not introduce evidence of the firearm at the hearing, nor was a photograph of it introduced. It was significant to the court that a video showed the blue Chevrolet, but there was no photograph of the interior of the vehicle from which the court could evaluate whether O'Diam could have seen the firearm in a door's pocket from his vantage point. There was "simply no evidence of contraband or [a] weapon being found prior to the search, except O'Diam's statement."

{¶ 25} The court noted that it "is reasonable to determine *Matlock* is holding the 'bright-line rule' that provides hearsay is admissible does not qualifiedly apply in all suppression hearings [sic]." The trial court noted that the Supreme Court of Ohio "examine[d] circumstances to determine the reliability of the statement in *Matlock* and analyze [its] effect. The circumstances of reliability should impact the admissibility of hearsay to support articulable suspicion, probable cause, or consent." The court determined:

> In this case, the court examines the testimony about the hearsay. Officer Orndorff testified, "I can't speak to when Detective O'Diam saw it, but I assume he saw it when he walked up to the vehicle." He later testified, "I believe he saw . . ." This is equivocal and uncertain language. Other factors show a lack of verification and unreliability.
>
> The state is arguing, impliedly, if not expressly, that something more than a minor misdemeanor traffic violation is present here. Thus, the state is asserting that removing passengers and making an arrest is proper as

opposed to "cite and release." One of the items of evidence is the high crime area. The Second District Court of Appeals has held that acts that are essentially neutral or ambiguous do not become specifically criminal in character because they occur in a high crime area. The mere presence of a vehicle in a high crime area, or even in an area identified with drug activity, without more, does not give rise to a reasonable, articulable suspicion that the vehicle, its owner, or its operator, is involved in criminal activity. The fact that [Chappell] and his occupant were in the Desoto Bass area parked in an arguably vacant property does not give rise to reasonable, articulable suspicion to believe they were involved in illegal activity at that time. There were no reports of drug sales involving the blue Chevrolet. There were no confidential reports. There were no complaints about the blue Chevrolet.

The second requirement is that the incriminating nature be immediately apparent. This is with regard to probable cause to believe that a crime was being committed. A firearm unsecured in a motor vehicle is probable cause that the statute regarding improperly [sic] handling probably was being violated as the driver did not have a permit. The exhibit indicates lack of a permit was not known at the time Detective O'Diam saw the firearm.

There are some standards for ordering passengers to exit motor vehicles lawfully during a traffic stop. Occupants cannot be ordered out simply for the convenience of the police, there needs to be some reason, such as officer safety. In this case, there was an altercation or differences

with Defendant. The passenger could have used the vehicle or something within to harm the officers. It is reasonable to secure the situation so the passenger could be fully observed by other officers. The court does note that many police officers arrived on the scene within a short time of the traffic stop.

* * *

* * * The balancing test should be applied here. On the one hand, the safety of officers. On the other hand, the intrusion upon the citizen's personal security and freedom from arbitrary interference. In this case, there is no serious threat to officer safety. The driver is out of the car and the passenger remains in the car. There are more police officers than citizens. There is no angry crowd. This is a very minor traffic violation that is being investigated. The police will soon have seven officers on the scene and it is occurring on a sunny afternoon.

There is no search warrant in this case. * * *

In this case, the state is relying on the plain view exception. The plain view exception is not sustained here because it is provided on the basis of hearsay that is not supported by sufficient indicia of reliability and truthfulness.

{¶ 26} The court further concluded:

A lawful traffic stop was executed here, though apparently pretextual. There was reasonable and articulable suspicion to believe that speeding and improper parking had occurred, although these officers were in the

midst of a drug investigation. The appropriateness of the traffic stop does not end the inquiry. This traffic violation is a minor misdemeanor "cite and release" type of offense. The officers were required to write a citation and release Defendant.

The officers conducted a warrantless search of a car. An exception does not apply because there is not admissible evidence that the plain view doctrine applies. The search was conducted without a warrant and no exception applies.

Hearsay is generally admissible and is not always admissible under every circumstance in a motion to suppress context. The interest of officer safety did not outweigh the interest in the freedom from interference.

{¶ 27} For these reasons, the trial court granted Chappell's motion to suppress.

{¶ 28} On November 1, 2019, the State certified that the suppression of the State's evidence had "rendered the state's proof with respect to the pending charge so weak in its entirety that any reasonable possibility of effective prosecution" had been destroyed, which permitted the State to appeal pursuant to Crim.R. 12(K)(2).

{¶ 29} On appeal, the State asserts the following assignment of error:

THE CRUISER-CAM VIDEO, ON WHICH DET. O'DIAM CAN BE HEARD ADVISING OFC. ORNDORFF THAT HE SAW A PISTOL WAS IN THE VEHICLE, ALONG WITH OFC. ORNDORFF'S OWN TESTIMONY ABOUT SEEING THE GUN IN THE CAR, UNDERMINES THE TRIAL COURT'S FINDING THAT NO EVIDENCE WAS ADMITTED THAT THE GUN WAS SEEN IN PLAIN VIEW. THE TRIAL COURT ERRED,

THEREFORE, IN SUSTAINING CHAPPELL'S MOTION TO SUPPRESS.

{¶ 30} The State asks this Court to determine whether the trial court fully and properly considered the totality of the evidence presented by the State at the suppression hearing when it sustained Chappell's motion to suppress a firearm located in his car. The State asserts that, in particular, the trial court erred in concluding that the Orndorff's testimony that O'Diam notified him that O'Diam saw a gun in Chappell's car was "merely hearsay," and that the hearsay alone could not be relied upon in determining whether the gun was in plain view. According to the State, there was in fact other evidence offered during the suppression hearing confirming that a gun was seen in plain view in Chappell's car before a search of the car was undertaken.

{¶ 31} The State asserts that O'Diam removed the passenger after seeing the gun inside the vehicle in plain view. O'Diam then informed Orndorff and Halburnt that he had observed a firearm in plain view, and Orndorff also later observed the gun in the car in plain view in the driver's side door compartment. The State asserts that, according to Orndorff, the gun would have been visible to O'Diam standing outside the passenger side door.

{¶ 32} The State further asserts as follows:

The trial court's assessment of the evidence is misguided for two reasons. First, while the trial court found [Orndorff's] testimony credible generally, it rejected his testimony about what was said to him by [O'Diam] about seeing a gun in the car because [O'Diam's] statement was hearsay and not verified by other evidence presented at the suppression hearing. But it is well-settled that hearsay is admissible during suppression hearings

* * *, and there is nothing that requires an officer's testimony to be verified by other evidence before [the court] can rely upon it; if the trial court believes the officer, that is enough.

Second, additional evidence offered at the suppression hearing *did* verify O'Diam's statement to Orndorff that he saw a gun in the car. Orndorff testified that he too saw the gun in plain view, and on the cruiser-cam video [O'Diam] can be heard telling [Orndorff] and [Halburnt] that he saw a pistol in Chappell's car, which [Halburnt] announced to the other officer's on the scene as being the reason why Chappell was being arrested. By seeming to ignore this additional evidence, which verified [O'Diam's] statement about a gun being in the car, the trial [court] erred in its assessment of the totality of the evidence. * * *

{¶ 33} The State asserts that the trial court properly found there was reasonable and articulable suspicion to warrant a traffic stop of Chappell's vehicle and that O'Diam was permitted to order the passenger out of the car. However, the State asserts that the trial court erred in concluding that, "based on the totality of the evidence presented at the suppression hearing, the State failed in its burden of showing that the gun found in Chappell's car was in plain view before it was seized."

{¶ 34} The State asserts:

In deciding the issue of plain view, the trial court seemingly limited its review of the evidence to only the testimony of [Orndorff] – and then to only part of Orndorff's testimony. Specifically, the trial court based its decision on the portion of [Orndorff's] testimony where he explained that

[O'Diam] told him that he (O'Diam) saw a firearm in the car. * * * The trial court found this testimony insufficient to show that the firearm was in plain view because [O'Diam] did not testify at the suppression hearing, and [Orndorff's] recounting of what [O'Diam] told him about seeing a firearm was hearsay that could not be verified by other evidence. * * *

But the trial court ignored the rest of [Orndorff's] testimony. In particular, after testifying that [O'Diam] told him that he (O'Diam) saw a firearm in the car, [Orndorff] went on to explain that the firearm would have been visible to [O'Diam] from his vantage point alongside the front passenger door because Orndorff himself also saw the gun in the compartment of the driver's side door. * * * When asked on cross-examination to clarify when [O'Diam] first saw the gun, [Orndorff] explained: I can't speak to when Det. O'Diam saw it, but I'd assume that he saw it as soon as he walked up to the vehicle *because from my vantage point, when I looked inside the vehicle, it was readily available* [sic] *and at hand in the driver compartment - - side door there."* * * *

In addition to [Orndorff's] testimony, the cruiser-cam video that was admitted at the suppression hearing solidified the fact that the gun was seen by [O'Diam] in plain view before the car was searched. The video shows [O'Diam] approach the passenger side of the car and speak to the passenger before removing the passenger from the car. * * * The video then shows [O'Diam] approach [Orndorff] and [Halburnt] (both are out of camera range), and [O'Diam] can be overheard saying that there is a pistol on the

driver's side. * * * [Halburnt] then tells everyone on scene that Chappell is being arrested because the car is parked illegally and "the guy [Chappell] has a gun in the car." * * *

(Footnote omitted; emphasis added.)

{¶ 35} In a footnote, the State acknowledges that O'Diam's advisement to Orndorff and Halburnt was "faint and hard to hear," but the State further asserts that Halburnt's follow-up questions and comments made it clear that O'Diam told him and Orndorff that he had seen a gun in the car.

{¶ 36} Chappell asserts that the trial court properly excluded the hearsay statements and that a review of the cruiser video showed that Orndorff was never positioned anywhere near where O'Diam allegedly made the observation. According to Chappell, the video showed that, when the unmarked police car pulled up, Orndorff walked to the front yard of the house to assist in the detention of Chappell, while a uniformed officer went to O'Diam's position at the passenger side of the car and stood behind O'Diam. As depicted in the video, Orndorff then walked to the driver's side of the car; 43 seconds later Orndorff opened the driver's door, looked down at the compartment, and the search of the vehicle began. Chappell observes that Orndorff was never "in the same position" as O'Diam on the passenger's side of the car. Chappell concludes that the trial court did not ignore Orndorff's testimony, as the State asserts; rather, it heard the testimony, considered it, and "found it wanting." Chappell notes that "[o]ne could assume" that the uniformed officer who stood behind O'Diam near the passenger side of the vehicle would have been called as a witness if he could have corroborated O'Diam's observation, but he was not called to testify.

{¶ 37} As this Court has noted:

"In ruling on a motion to suppress, the trial court 'assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses.' " *State v. Prater*, 2012-Ohio-5105, 984 N.E.2d 36, ¶ 7 (2d Dist.), quoting *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). "As a result, when we review suppression decisions, 'we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard.' " *Id.*, quoting *Retherford.*

*State v. Boyd*, 2d Dist. Montgomery No. 28490, 2020-Ohio-125, ¶13.

{¶ 38} *State v. Brannack*, 6th Dist. Williams Nos. WM-04-005, WM-04-006, 2005-Ohio-1386, is similar to this case in that the trial court derived facts from the testimony of a trooper as well as a video of the traffic stop at a suppression hearing. *Id.* at ¶ 3. The State asserted that the appellate court "need not accord any deference to the trial court's findings of fact" because it could view the videotape de novo. *Id.* at ¶ 27. Significantly, the Sixth District disagreed, concluding that the fact that an appellate court has access to a videotape does not change its standard of review. *Id.* at ¶ 28. The Sixth District applied the standard of review set forth above, and we agree that the existence of a video does not change the standard of review. Although it may be tempting to trust or credit a video of an event, judges should necessarily be wary not to place too much trust in a video, because doing so may interject the judges' (or the State's) subjective and contestable

interpretative preferences about what gestures and declarations in the video actually mean. *See, generally,* Granot, *In the Eyes of the Law: Perception Versus Reality in Appraisals of Video Evidence,* 24 Psychology, Public Policy, and Law 93 (2018).

**{¶ 39}** It is well-settled that "[w]hen a lawfully stopped vehicle contains passengers, the Fourth Amendment permits law enforcement officers to detain those passengers for the duration of the lawful detention of the driver." *State v. Brown,* 2d Dist. Montgomery No. 20336, 2004-Ohio-4058, ¶ 14, citing *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). Further:

> The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" Searches and seizures conducted without a warrant are per se unreasonable unless they come within one of the " 'few specifically established and well delineated exceptions.' " *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), quoting *Thompson v. Louisiana*, 469 U.S. 17, 20, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984). Evidence is inadmissible if it stems from an unconstitutional search or seizure. *Wong Sun v. United States*, 371 U.S. 471, 484-85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
>
> The plain view doctrine is an exception to the search warrant requirement. *State v. Hunter*, 2d Dist. Montgomery No. 24350, 2011-Ohio-6321, ¶ 31, citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). "Under the plain-view exception, 'police may seize an article when its incriminating nature is immediately apparent to an officer

who comes in contact with the item through lawful activity.' " *State v. Thompson*, 2d Dist. Montgomery No. 25658, 2013-Ohio-4825, ¶ 13, quoting *State v. Pounds*, 2d Dist. Montgomery No. 21257, 2006-Ohio-3040, ¶ 19. "The police officer need not be absolutely certain that the item seen in plain view is contraband or evidence of a crime.   It is sufficient if probable cause exists to associate the item with criminal activity."   *Pounds* at ¶ 19, citing *State v. Stiffler*, 2d Dist. Montgomery No. 21008, 2006-Ohio-46, ¶ 15.

*Boyd* at ¶15-16.

{¶ 40} The following is well-settled:

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."   Evid.R. 801(C).   "To constitute hearsay, two elements are needed. First, there must be an out-of-court statement. Second, the statement must be offered to prove the truth of the matter asserted.   If either element is not present, the statement is not 'hearsay.' " (Footnote and citations omitted.) *State v. Maurer*, 15 Ohio St.3d 239, 262, 473 N.E.2d 768 (1984). *Accord State v. Tate*, 2d Dist. Montgomery No. 25386, 2013-Ohio-5167, ¶ 75.

*Abrams v. Abrams*, 2017-Ohio-4319, 92 N.E.3d 368, ¶ 30 (2d Dist.).

{¶ 41}  As noted by the Supreme Court of Ohio:

Hearsay statements are deemed sufficiently reliable to allow their admission without the benefit of cross-examination when the statements (1) "[fall] within a firmly rooted hearsay exception," or (2) contain " 'adequate

indicia of reliability.' " *Ohio v. Roberts* (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608.

*State v. Madrigal*, 87 Ohio St.3d 378, 385, 721 N.E.2d 52 (2000).

{¶ 42} In *State v. Brown*, 2d Dist. Montgomery No. 27571, 2018-Ohio-3294, ¶ 21, this Court observed:

An out of court statement is not hearsay if it "is offered to prove a statement was made and not for its truth, * * * to show a state of mind, or to explain an act in question." *Maurer* at 262. *Accord State v. Williams*, 38 Ohio St.3d 346, 348, 528 N.E.2d 910 (1988) (finding "[a] statement is not hearsay if it is admitted to prove that the declarant made it, rather than to prove the truth of its contents"). * * *

{¶ 43} This Court has further noted that a trial court has broad discretion[1] to admit or exclude evidence in a suppression hearing, and it is well-settled that the rules of evidence and the hearsay exclusionary rule do not apply in a suppression hearing. *State v. Bishop*, 2d Dist. Clark No. 2003 CA 37, 2004-Ohio-6221, ¶18-19, citing *State v. Woodring*, 63 Ohio App.3d 79, 81, 577 N.E.2d 1157 (1989). "In accordance with Evid.R. 101(C)(1) and Evid.R. 104(A), the undisputed status of a witness's testimony as hearsay does not per se bar its use." *Id.*

{¶ 44} We have reviewed the cruiser camera video. It was proffered by the State

---

[1] " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." (Citation omitted.) *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Most abuses of discretion "result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* Decisions are unreasonable when they are not supported by a sound reasoning process. *Id.*

to support Orndorff's suggestion that the weapon in the vehicle was visible to O'Diam before or in the course of his removal of the passenger from the vehicle, and to thereby attempt to establish the plain view exception to the warrant requirement. We note that the tape does not reflect the entire interaction of all the officers in the course of the passenger's removal and Chappell's arrest. The camera angle is focused exclusively on the front of Chappell's vehicle, and the officers appear and disappear from view in the course of the encounter. Additionally, there are often multiple individuals in the vicinity of Halburnt's microphone, and it is not always clear which of them is speaking when not within the camera angle.

{¶ 45} In the video, Halburnt's cruiser arrives on the scene and parks facing Chappell's vehicle, bumper-to-bumper. After Halburnt exits his cruiser and passes in front of it to approach Chappell, who steps outside of the camera angle, Halburnt, the only officer wearing a microphone, can be heard asking Chappell for identification. Chappell protests. Next, the video depicts O'Diam and Orndorff's vehicle seemingly pulling up on the driver's side of Halburnt's cruiser. Orndorff exits from the passenger side of that cruiser and crosses in front of Halburnt's cruiser; according to Orndorff's testimony, Orndorff was going to assist Halburnt (again outside of the camera angle).

{¶ 46} O'Diam then appears on screen and approaches the passenger side of Chappell's Malibu. O'Diam knocks on the window of the vehicle, opens the passenger door, and signals the passenger to exit the vehicle. Once outside the car, the passenger briefly places his hands on the roof of the car and is given an abbreviated pat-down. O'Diam then places him in handcuffs while talking to him, although their conversation is unclear. Thereafter, O'Diam gestures into the interior of the vehicle while a uniformed

officer approaches from between the undercover vehicle and Halburnt's cruiser. As O'Diam continues speaking to the passenger, the uniformed officer stands behind O'Diam. O'Diam then gestures into the interior of the vehicle with an open right palm, and the passenger appears to tilt his head slightly. O'Diam then passes the passenger to the uniformed officer and another officer who approaches from the driver's side of the undercover vehicle.

{¶ 47} O'Diam and the uniformed officer who stood behind him then walk in front of Halburnt's cruiser. Halburnt can be seen placing a wallet and identification on the hood of his cruiser and then passing in front of it, while O'Diam, Orndorff and the uniformed officer gather at the front passenger side of the cruiser. While only the uniformed officer is within the camera angle, a voice says, "He's got a pistol," and another voice says, "Oh really?" A purported description of the pistol's location is not audible. Orndorff then approaches the *driver's side door* of the Malibu, stands by the back door of the vehicle, and seemingly looks down and inside the driver's side window. Halburnt then says, "This car's parked illegally and this guy has a gun in the car." The unidentified uniformed officer who was with O'Diam as the passenger was removed then searches the entire vehicle, but the video does not depict him opening or retrieving anything from the driver's door compartment.

{¶ 48} As noted above, the trial court determined that O'Diam was "in a lawful place when he made the observation" and that "this was a lawful intrusion." The trial court then concluded, however, that there was simply no evidence of contraband or a weapon being found prior to the search "*except O'Diam's statement*" as related by Orndorff. (Emphasis added.) In addressing the hearsay nature of Orndorff's testimony,

the trial court noted that the hearsay evidence was not "set[ting] the scene," but was offered for the "truth of the matter." The trial court determined that there was not sufficient indicia of reliability and truthfulness in Orndorff's recounting of O'Diam's statement about the presence of the firearm and that, accordingly, there was not *admissible* evidence that the plain view doctrine applied. In other words, the trial court concluded that Orndorff's testimony did not provide sufficient objective support for O'Diam's declaration. Orndorff testified that O'Diam told him about the weapon "*at some point*" and, as the trial court noted, when asked at what point O'Diam observed the gun, Orndorff responded by stating, "*I can't speak to when Det. O'Diam saw it, but I'd assume* that he saw it as soon as he walked up to the vehicle because *from my vantage point*, when I looked inside the vehicle, it was readily available and at hand in the driver compartment * * * side door there."

{¶ 49} We defer to the trial court's assessment of witness credibility. Here, the court examined Orndorff's testimony about O'Diam's hearsay statement and characterized his testimony as equivocal and uncertain. Since O'Diam did not appear at the suppression hearing to provide testimonial evidence regarding his observation of the firearm, his statement was not subject to the trial court's expertise and evaluation regarding credibility. O'Diam's observation also was not subject to cross-examination by Chappell. As this Court has noted, "the opportunity for meaningful cross-examination has been synonymous with indicia of reliability sufficient to satisfy the constitutional right of confrontation." (Citation omitted.) *State v. Howard,* 2d Dist. Montgomery No. 19413, 2003-Ohio-3235, ¶ 32.

{¶ 50} Based on our review of the video, which is limited by scope and focus, we

conclude that it was subject to multiple interpretations, and we cannot say the trial court erred in finding that the plain view exception to the warrant requirement was not established. In other words, we cannot conclude that the video undermined the trial court's finding that there was a lack of reliable, admissible evidence to established that the firearm was in O'Diam's plain view. Some of the video was subject to more than one interpretation. The court was not required to credit O'Diam's declaration and Orndorff's speculative testimony about the visibility of the firearm from O'Diam's vantage point. And we will not elevate the video over testimonial evidence, which was lacking.

{¶ 51} Finally, although not dispositive, the trial court noted that "there was no photograph of the interior of the vehicle" from which the court could evaluate whether O'Diam could have seen the firearm in the driver's side door's pocket from his vantage point on the passenger side. It was the State's burden to establish the plain view exception to the warrant requirement, and we conclude that the State was not entitled to the benefit of its own inferences regarding the location and observation of the firearm. In reality, the video does not provide us O'Diam's viewpoint, and O'Diam's credibility was not tested.

{¶ 52} For the foregoing reasons, we conclude that the trial court properly applied the law regarding hearsay and the plain view exception to the facts herein by sustaining Chappell's motion to suppress. Accordingly, the State's assignment of error is overruled.

{¶ 53} The judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, J., concurs.

WELBAUM, J., dissents:

{¶ 54} I very respectfully disagree with the majority's conclusion that the trial court's order suppressing evidence should be affirmed. I believe the court erred when it ruled that there was no admissible evidence that the plain view exception applied. *See* Decision & Entry, Oct. 25, 2019, p. 10 and 13. As a result, I would reverse the trial court's order, with directions to reconsider the motion by applying the correct laws of evidence pertaining to hearsay in suppression hearings.

{¶ 55} " 'Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses.' " *State v. Koon,* 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13, quoting *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. " 'Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " *Id.* "The application of the law to the trial court's findings of fact is subject to a de novo standard of review." (Citations omitted.) *State v. Turner,* 2015-Ohio-4612, 48 N.E.3d 981, ¶ 10 (2d Dist.). *Accord State v. Ojezua,* 2016-Ohio-2659, 50 N.E.3d 14, ¶15 (2d Dist.).

{¶ 56} When a trial court applies the wrong legal standard or misapplies the correct legal standard, the court abuses its discretion. *Woodring*, 63 Ohio App. 3d 79, 81, 577 N.E. 2d 1157. *See also Enquip Technologies Group Inc. v. Tycon Technoglass S.R.L,* 2d Dist. Greene Nos. 2009 CA 42, 2009 CA 47, 2010-Ohio-28, ¶ 134 (Fain, J., concurring)

(where abuse of discretion is concerned, a court may not commit an error of law); *Beatty v. Urbania*, 7th Dist. Columbiana No. 17 CO 0023, 2019-Ohio-245, ¶ 37; *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.).

{¶ 57} Furthermore, the standard of review is de novo here, because the issue is whether the trial court misapplied the law in arriving at its decision to grant the motion to suppress. Specifically, the trial court held that "there was not admissible evidence that the plain view doctrine applies." Decision at p. 13. According to the decision, this conclusion was premised on the incorrect belief that to be admissible, hearsay must be verified by other objective evidence presented at the suppression hearing.

{¶ 58} In addition, the trial court's factual finding that the hearsay was not sufficiently reliable for admission as evidence was not supported by competent, credible evidence. *See State v. Freeman*, 9th Dist. Summit No. 27617, 2015-Ohio-2501, ¶ 18 (holding that, at a suppression hearing, hearsay information an officer received from fellow officers in making a traffic stop was sufficient, absent a finding that the officer was unreliable or had poor credibility). *See also Woodring* at 82 (concluding that in excluding hearsay testimony at a suppression hearing, the trial court applied an incorrect legal standard and abused its discretion). In view of these legal principles, the trial court abused its discretion when it failed to consider the hearsay testimony about Officer O'Diam's statement.

{¶ 59} When discussing the need for indicia of reliability, the trial court noted the absence of "objective support" for Officer O'Diam's statement. Decision at p. 10. In contrast, however, the United States Supreme Court held in *Matlock* that the district court erred in excluding "otherwise reliable" evidence on the basis of the Rules of Evidence.

*Matlock*, 415 U.S. 164, 175, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

**{¶ 60}** The crux of the State's appeal is that the hearsay evidence relating to whether the gun was in O'Diam's plain view prior to the search was otherwise reliable and admissible, and the trial court erred when it refused to consider such evidence. Regarding admissibility of hearsay in suppression hearings, we have stated that:

"[T]he rules of evidence normally applicable in criminal trials do not operate with full force and effect in hearings before the judge to determine the admissibility of evidence." *U.S. v. Matlock* (1974), 415 U.S. 164, 172–73, 94 S.Ct. 988, 39 L.Ed.2d 242. A * * * motion to suppress evidence challenges its admissibility. Therefore, in ruling on the motion, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial. *U.S. v. Raddatz* (1980), 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424. Evid.R. 101(C)(1) creates an exception to the Rules of Evidence with respect to "[d]eterminations prerequisite to the admissibility of evidence when the issue is to be determined by the court under Evid.R. 104." That rule provides that questions concerning admissibility shall be determined by the court. Such determinations implicate the right of confrontation in only a limited way, if at all.

*State v. Tucker*, 2d. Dist. Montgomery No. 20956, 2005-Ohio-5227, ¶ 8. *See also State v. McCray*, 2d Dist. Montgomery No. 26519, 2015-Ohio-3049, ¶ 15; *State v. Ginn*, 2d Dist. Montgomery No. 2013-Ohio-1649, ¶ 25; *State v. Rhines*, 2d Dist. Montgomery No. 24203, 2011-Ohio-3615, ¶ 24.

**{¶ 61}** In *Rhines,* we relied upon the above-quoted language and provided the

following rationale:

> "This Court * * * has noted that the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself.   At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.   *United States v. Matlock,* 415 U.S. 164, 172-174, 94 S.Ct. 988, 993-994, 39 L.Ed.2d 242 (1974);   *Brinegar v. United States,* 338 U.S. 160, 172-174, 69 S.Ct. 1302, 1309-1310, 93 L.Ed. 1879 (1949);   Fed. Rules Evid. 104(a), 1101(d)(1). * * * We conclude that the process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself."   *Raddatz,* supra, at 679. (Citation omitted.)

*Rhines* at ¶ 23.   The Sixth Circuit and the Supreme Court of Ohio are also in accord.   *See United States v. Stepp*, 680 F.3d 651, 688 (6th Cir.2012); *State v. Edwards,* 107 Ohio St. 3d 169, 2005-Ohio-6180, 837 N.E. 2d 752, ¶ 14-15.

{¶ 62} A Tenth Circuit Court of Appeals case clearly illustrates the error here.   *See United States v. Miramonted*, 365 F.3d 902 (10th Cir.2004).   In *Miramonted*, the district court granted a motion to suppress because the Government had only called one witness, Denver Police Officer Garcia, to testify.   Garcia had seized a gun in Miramonted's vehicle, but "some, if not much, of Garcia's testimony was based on hearsay."   *Id.* at 904.

{¶ 63} In granting the motion to suppress, the district court stated that "Officer Garcia was nothing but a spectator" and therefore suppressed the evidence because the victim did not testify about most of the facts supporting probable cause.   *Id.*   Other officers were present at the scene and also did not testify, but the district court did not

mention that point. *Id.* In reversing the district court, the court of appeals commented that:

> At the outset, we agree with counsel that some, if not much, of Garcia's testimony was based on hearsay. But hearsay testimony is admissible at suppression hearings such as the present one and should be considered by a district court in deciding whether an arrest was based on probable cause. *U.S. v. Matlock,* 415 U.S. 164, 173, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (Rules of evidence applicable in criminal jury trials do not govern at hearings before a judge to determine pre-trial evidentiary matters, such as the admissibility of evidence at trial.) *See also U.S. v. Merritt,* 695 F.2d 1263, 1270 (10th Cir.1982) (police should be permitted to offer hearsay as testimony to support reasonable suspicion.) *See* Federal Rules of Evidence 104.

*Miramonted* at 904.

{¶ 64} Rather than remanding for further proceedings, the Tenth Circuit Court of Appeals reversed the order to suppress evidence. In particular, the court noted that the district court had " 'latitude to receive evidence notwithstanding the hearsay rule,' " and that " 'probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest.' " *Id.* at 905, quoting *Merritt* at 1268-1269. The court of appeals further observed that:

> We then went on to state, in *Merritt*, that the "excluded evidence, when considered with the other evidence that was heard by the district court on the reasonable suspicion issue, was sufficient to *require* the conclusion as

a matter of law that the police had reasonable suspicion to make an investigatory stop," out of which the challenged evidence was obtained. *Id*. at 1270-71 (emphasis added). Here, there was no excluded testimony, and all hangs on Garcia's testimony, which, when considered in its totality, in our view, dictates a finding of probable cause to arrest the defendant, thereby legitimatizing the ensuing arrest and search.

*Miramonted* at 905. In the case before us, the trial court made errors like those of the district court in *Miramonted*.

{¶ 65} As a further matter, the record here contains neither evidence nor a rationale from the trial court concerning why the hearsay was not otherwise reliable. Even if the court correctly held that indicia of reliability supported by objective evidence were required to satisfy the low threshold required for admissibility, plenty of other evidence supported Officer O'Diam's statement to Officer Orndorff that he saw a firearm located inside the driver's side door in plain view. Arguably, more evidence supports admissibility of the hearsay here than in *Miramonted,* where the court of appeals not only reversed the trial court for excluding the evidence, but also reversed the order suppressing the evidence without remand.

{¶ 66} Here, the cruiser cam video shows O'Diam approach the passenger side of the car and speak to the passenger. O'Diam then opened the passenger door to let the passenger exit. Thereafter, O'Diam met with Orndorff and Halburnt outside the view of the camera. The cruiser cam audio contains O'Diam's faint but discernable reference to a pistol to Halburnt and Orndorff. The follow-up conversation between the officers clearly indicated that O'Diam told them that he saw a gun in the car – because Halburnt then told

everyone on the scene that Chappell was being arrested because the car was parked illegally and "the guy" had a gun in the car. *See* State's Ex. 1, 16:55:11 to 16:55:25.

{¶ 67} As indicated in the majority opinion, Officer Orndorff narrated the video, (State's Ex. 1) at the suppression hearing. In this regard, the following exchange occurred:

Prosecutor: And the individual in the black vest, it that * * * Det. O'Diam?

Orndorff: Yes it is.

Prosecutor: And when he opens the door and pulls that passenger out, does he relay information to you?

Orndorff: Yeah, he - - at some point, he relays information that there is a firearm inside the vehicle. I believe that see [sic] it - - he seen it before he

- -

Defense Counsel: Objection to - -

Orndorff: opened the door.

{¶ 68} The trial court admitted this evidence "with the understanding that the statement would be admitted for the purpose of setting up the scene, not for the truth of the whether O'Diam saw anything." The State has not appealed the accuracy of this ruling.

{¶ 69} Orndorff then testified that when he opened the driver's side car door, he saw the gun inside the door as described by O'Diam. During direct examination of Orndorff, the following exchange occurred:

Prosecutor: So he related information to you about a location of a gun; did you later see that gun that he was talking about?

Orndorff:   I did.

Prosecutor:   And can you describe what you saw?

Orndorff:   * * * It was in the driver's side door, in the compartment of the driver door.

Prosecutor:   And from the vantage point of where O'Diam is, would that have been visible to him - -

Orndorff:   Yes, it would be.

Prosecutor:   -- based off of what - - where you saw the gun?

Orndorff:   That is correct.

Orndorff also later testified:

I can't speak to when Det. O'Diam saw it, but I'd assume that he saw it as soon as he walked up to the vehicle because from my vantage point, when I looked inside the vehicle, it was readily available [sic] and at hand in the driver's compartment—side door there.

Suppression Tr. at p. 25.   This is competent circumstantial evidence that O'Diam observed the gun in plain view.

{¶ 70}   Again, the weight to be given to the hearsay evidence upon its admission is not the issue raised here.   Rather, the issue is whether the hearsay evidence that the firearm was in plain view was otherwise reliable and should have been admitted. Consequently, I would reverse the order suppressing the evidence and remand with instructions to the trial court to reconsider the motion to suppress by applying the correct law pertaining to admissibility of hearsay in suppression hearings.

{¶ 71} Therefore, I very respectfully dissent.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Christopher W. Thompson
Hon. Timothy N. O'Connell